**[PUBLISH]**

# IN THE UNITED STATES COURT OF APPEALS

## FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
DECEMBER 12, 2005
THOMAS K. KAHN
CLERK

_____

**No. 03-12185**

_____

D. C. Docket No. 00-00683-CR-JAL

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

GRISEL ARIAS,
MARCO BURGOS,
SUZANNE BURGOS,
PEDRO SARDUY,
IDANIA C. ARIAS,
DALIA LANDROVE,
MICHAEL IHEAGWARA,

Defendants-Appellants.

_____

**No. 03-14589**

_____

D. C. Docket No. 00-00683-CR-JAL

UNITED STATES OF AMERICA,

                                        Plaintiff-Appellee,

                        versus

GRISEL ARIAS,

                                        Defendant-Appellant.

————————————————————

**No. 04-14839**

————————————————————

D. C. Docket No. 00-00683-CR-JAL

UNITED STATES OF AMERICA,

                                        Plaintiff-Appellee,

                        versus

SUZANNE BURGOS,

                                        Defendant-Appellant.

————————————————————

**Appeals from the United States District Court
for the Southern District of Florida**

————————————————————

**(December 12, 2005)**

**Before TJOFLAT and BARKETT, Circuit Judges, and MILLS[*], District
Judge.**

---

[*]Honorable Richard Mills, United States District Judge for the Central District of Illinois, sitting
by designation.

2

**BARKETT, Circuit Judge:**

In consolidated appeals No. 03-12185 and No. 03-14589, Grisel Arias, Marco Burgos, Suzanne Burgos, Pedro Sarduy, Idania C. Arias, Dalia Landrove, and Michael Iheagwara appeal their convictions for conspiracy and other crimes relating to a scheme to defraud the Medicare program. With the exception of Dalia Landrove, each also appeals the sentence imposed by the district court.[1]

## I. Background

The scheme to defraud Medicare involved the collusion of doctors and physicians' assistants, pharmacists, recruited "patients," and durable medical equipment ("DME") companies.[2] The alleged head of the scheme, Jose Arias (who was charged in the initial indictment, and subsequently pled guilty to the conspiracy count and cooperated with the government) incorporated several of the DME companies and owned two clinics, First Option Diagnostic Center and First Option Medical Center. The scheme operated as follows. The DME companies paid recruiters to locate Medicare-eligible persons to serve as patients. These recruited "patients" were paid to visit Arias' clinics, where doctors or physician's

---

[1] In appeal No. 04-14839, Suzanne Burgos appeals the denial of her motion for a new trial, based on an alleged Brady violation. Finding no error, we affirm the ruling of the district court without further discussion.

[2] DME companies supply medical equipment such as wheel chairs, hospital beds and, more specifically in this case, the nebulizer machines utilized by some patients to vaporize aerosol medication so that the patient can easily inhale it.

assistants falsely certified diagnoses. The principal diagnosis in the scheme was Chronic Obstructive Pulmonary Disease ("COPD"), a disease whose symptoms include shortness of breath, coughs, and decreased exercise capability. Once the false diagnosis was made, a certificate of medical necessity ("CMN") was signed by a doctor stating that the Medicare beneficiary required certain medical equipment and respiratory medication. The CMN acted as a prescription for the required medicine and equipment. The CMNs were then sent to the DME companies, which billed Medicare for the unnecessary CMN-prescribed medical equipment and respiratory medications, particularly certain aerosol medications supplied by the pharmacies. As part of the scheme, the pharmacies supplied "compounded" respiratory aerosol medications to the DME companies. Compounding is a pharmacy procedure in which a pharmacist makes medication by mixing several raw materials at the pharmacy. Compounded medications are rarely prescribed by doctors and, according to expert testimony, should only be provided to a patient when specifically prescribed. However, the pharmacies involved in the scheme almost always provided compounded aerosol medications, even though commercially-manufactured, FDA-approved aerosol medications were available.[3]

---

[3]According to the government, the compounding was more profitable, but would also benefit the fraudulent scheme by making it more difficult for an investigator to ascertain that the pharmacies

4

The DME companies participating in the scheme ostensibly procured the medication from the pharmacies on behalf of the patients, often obtaining the patient medications in mass quantity, bringing stacks of prescriptions to the pharmacies once a month.[4]  Sometimes the DME companies delivered the respiratory medications to patients; in other instances, the DME company never delivered the medication to the patient.  Additionally, the pharmacies at times delivered only half the patients' medication to the DME companies.  In some instances, the pharmacies provided only labels and invoices to the DME companies, rather than any actual medication.

Defendants Grisel Arias, Idania Arias, and Dalia Landrove operated DME companies involved in the scheme.  Idania Arias also owned and operated J&A Billing Company, through which all Medicare claims from the DME companies were processed.  Pedro Sarduy was a doctor at First Option Medical Center, where

were purporting to supply a greater amount of medicine to the DME companies than would be possible, based on the amount of medicine or materials purchased from manufacturers.

The evidence also indicated that the pharmacies did not follow proper procedures in making and storing the aerosol medication.  The government argued that the sloppy compounding further evidenced the fraudulent scheme: the pharmacies were lax in their procedures because they knew that no patient actually needed or used the medication they were compounding.
We do note that although compounding played an integral part in the overall scheme, the evidence relating to compounding provided only circumstantial evidence of the fraud.  As the jury was properly instructed, the compounding alone was not illegal.

[4] Although the DME companies picked up the prescriptions in bulk, the pharmacy would fraudulently date the labels to vary the dispensal dates, creating the appearance that the prescriptions were issued in the normal course of business.

he allegedly falsely diagnosed the "patients" with COPD. Marco and Suzanne Burgos, who were married during the time of the conspiracy, operated South Beach Pharmacy and La Moderna Pharmacy, two of the pharmacies supplying the aerosol medications to the fraudulent DME companies. Michael Iheagwara was a co-owner of La Moderna before leaving to create Maz Pharmacy. Iheagwara and Suzanne Burgos were both pharmacists.

## II. Discussion

As noted earlier, Jose Arias, the alleged head of the scheme, pled guilty and cooperated with the government, although he did not testify at trial. After a joint trial before a jury, the Appellants were convicted.[5] We consider all of the arguments of each Appellant in turn, but engage in an extended discussion regarding only Michael Iheagwara and Pedro Sarduy.[6]

### A. Grisel Arias

Grisel Arias argues that her conviction should be reversed because: (1) the

---

[5] Five additional co-defendants were tried jointly with the Appellants. The jury acquitted four: Reinaldo Landrove, an officer of a DME company; Janeide Regueiro, who worked at South Beach Pharmacy; and Azubueze Ikejiani and Magnus Ogbenna, the co-owners of Maz Pharmacy (with Michael Iheagwara). The fifth, Vincente Bouza, a doctor, was convicted but did not appeal.

[6] Marco Burgos did not individually submit a brief, and instead adopted the arguments of the other Appellants. Other Appellants have variously adopted the arguments of their co-Appellants, as well. Because the only two arguments in which we find merit affect only the individuals who made them, there is no need for us to detail the parties' adoption of arguments, and we do not do so.

evidence was not sufficient to support her conviction; (2) her Confrontation Clause rights were violated when the court refused to permit her to re-call a government witness who pled guilty to an unrelated drug charge subsequent to testifying in this case; (3) the government withheld exculpatory evidence in violation of Brady v. Maryland, 373 U.S. 83 (1963); (4) the district court erred in denying her requested continuance when a superseding indictment was issued one month before trial; and (5) the court erroneously refused to give a requested jury instruction pertaining to the evidence that she had acted in "good faith" and not with fraudulent intent. She also argues that her sentence should be vacated because in calculating her guideline sentence, the district court incorrectly calculated the loss attributable to her.

We have carefully considered the record and find no merit to any of these contentions. First, the evidence was clearly sufficient to support her conviction. Without cataloguing each piece of evidence against Grisel Arias, we note that the government submitted documents establishing that Grisel Arias was the original president and incorporator of two DME companies involved in the fraud scheme, Bird Road Medical Services and, subsequently, New Advanced Medical Equipment Corporation; on the evidence presented, the jury could have concluded that these companies were not conducting any legitimate transactions. Grisel authorized Medicare provider application forms for both these DME companies.

Although she alleged that some signatures were forged, the jury was entitled to determine that the documents were authentic. Additionally, Carlos Amador, a La Moderna pharmacy technician who pled guilty to the conspiracy, testified that Grisel would come to the La Moderna facility "[a]t least once a month" during the year he worked there, and that she picked up half-filled prescriptions of aerosol medications from him at the pharmacy.[7]

Second, the district court did not abuse its discretion in refusing to allow the recall of Amador or the introduction of documents relating to the drug charge against him. The sole purpose in seeking further testimony from Amador was impeachment, the questioning would have been cumulative of that already permitted during cross examination, and Amador had represented that he would simply invoke his Fifth Amendment privilege if recalled.[8] Third, Grisel Arias did not have a valid Brady claim, because when viewed in context, the purported contradictions between Jose Arias' sentencing testimony and the prosecution's

---

[7] This evidence supporting Grisel Arias' conviction on the conspiracy charge was also sufficient to support her conviction on the "kickback" counts. Under the Pinkerton theory of vicarious liability, Grisel could be convicted for the kickback offenses even without proof of her direct involvement, because the kickbacks were reasonably foreseeable and in furtherance of the conspiracy. See United States v. Mothersill, 87 F.3d 1214, 1218 (11th Cir. 1996).

[8] Ordinarily, drug use is not a valid subject for impeachment. See United States v. Clemons, 32 F.3d 1504, 1511 (11th Cir. 1994) ("This circuit has long adhered to the proposition that a witness's use of drugs may not be used to attack his general credibility, but only his ability to perceive the underlying events and to testify lucidly at trial."). Thus, had the government not opened the door to the subject of Amador's drug use during direct examination, questions relating to Amador's drug use would clearly have been impermissible.

8

pretrial letter describing his statements are not material. Fourth, in this complex multi-defendant case, the district court did not abuse its discretion by denying Grisel a continuance after the second superseding indictment included additional details concerning the DME New Advanced Medical Equipment Corporation; the government had previously disclosed New Advanced materials during discovery, and the superseding indictment did not add new charges or alter the theory of prosecution. Fifth, the district court did not abuse its discretion by refusing Grisel's request for a "good faith" instruction, as there is no foundation in the evidence for such an instruction.[9] Finally, the district court did not err in calculating the amount of loss attributable to Grisel – in a jointly undertaken criminal activity, each defendant is responsible for "all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity." U.S.S.G. § 1B1.3(a)(1)(B).

## B. Idania Arias

Idania Arias argues that the district court erred by refusing to admit evidence to support her defense that she was completely subservient to her husband, Jose Arias, and therefore unable to formulate the mens rea for the crime and by refusing

---

[9] Amador's testimony that he delivered "legitimate" drugs to Grisel does not provide a foundation for us to find good faith, as his own testimony confirms that the delivery was of only a half portion of "legitimate" medication. It is the missing half-portion that establishes the fraud, here, not the "legitimate" half-portion that was delivered.

9

to dismiss the money laundering charge against her, where there existed a fatal variance between the crime charged in the indictment and the proof at trial. Regarding her sentence, she argues that the district court should have ordered a psychiatric evaluation after her counsel represented that she was unable to meaningfully assist in preparing for sentencing.

The district court did not abuse its discretion in excluding Idania's expert witness. In order to be admissible, the expert evidence must establish that Idania was not able to form the mens rea for the crime; however, Idania's expert witness provided evidence of justification, not lack of mens rea. Nor did the district court abuse its discretion by excluding Idania's other evidence regarding subservience, based on its determination that the evidence was not relevant.[10] The court did not err in refusing to dismiss the money laundering charge against Idania. The facts proved at trial did not deviate materially from the language of the indictment, and bank records provided by the government in discovery sufficiently notified Idania that facts relating to Medicos Marketing transactions would be included in the money laundering case. Finally, after hearing testimony from Idania's treating

---

[10] The district court did allow Idania to present evidence of Jose Arias' physical and mental abuse of Idania, as well as relevant evidence about Jose's mistress' involvement in business matters relating to the conspiracy. The excluded evidence offered by Idania related to, inter alia, a home invasion at the Arias residence, the kidnapping of Idania and her young sons, and Idania's menstruation stopping at age thirty-two. Neither the home invasion nor the kidnapping was purported to have been committed by anyone involved in the conspiracy.

psychiatrist at FDC Miami, the district court had adequate information to evaluate Idania's mental condition, and did not abuse its discretion in denying further psychiatric evaluation before sentencing.

## C. Dalia Landrove

Dalia Landrove argues that the district court erred by failing to remove a juror for cause or to inquire more thoroughly into that juror's ability to be fair and impartial, and by allowing the prosecution to characterize her tax returns as fraudulent with no evidentiary basis. We find that the district court's inquiry into this juror's misconduct was well within the court's discretion, and that the prosecution's use of Landrove's tax returns cannot be deemed a harmful error.

## D. Suzanne Burgos

Suzanne Burgos argues that the evidence was not sufficient to support her conviction; that the district court erred by admitting certain extrinsic evidence and by treating an inspector's audit as intrinsic rather than extrinsic evidence; and that the district court should not have instructed the jury on deliberate ignorance. Burgos also argues that in determining her guideline range for sentencing, the district court incorrectly calculated the loss attributable to her.

After careful review of the record, we find that the evidence was sufficient to support the jury's conclusion that Suzanne Burgos knowingly participated in the

11

conspiracy. Documentary evidence established that Suzanne was a corporate officer of both La Moderna Pharmacy and South Beach Pharmacy, and several witnesses testified that Suzanne was involved in hiring personnel for those pharmacies, including personnel whose work involved filling the fraudulent aerosol prescriptions. Mary Ghabrial, who worked as a managing pharmacist at La Moderna and was not charged with any wrongdoing, testified that Suzanne Burgos was manager of the pharmacists at these pharmacies and "always made it a point to know what was going on in each pharmacy. . . . She called at the end of the day to get the sales and how many [prescriptions] . . . ." In her daily reports to Suzanne, Ghabrial was required to report aerosol sales separately.

Ghabrial further testified that although she was hired to supervise only the prescription area at La Moderna, which did not include the aerosol compounding section, she became aware that significant quantities of aerosol medication were nonetheless being dispensed with La Moderna labels, often with Ghabrial's initials as dispensing pharmacist, without her supervision. Ghabrial testified that she informed Suzanne Burgos about this. Additionally, according to Ghabrial's testimony, Areta Ruiz, a pharmacy technician, was dispensing aerosol medication from Peripheral DME, a DME company located next door to and affiliated with La Moderna, with no apparent pharmacist supervision, as is required by law. On cross

12

examination, Ghabrial testified that Ruiz reported to either Marco or Suzanne

Burgos. Additionally, Ghabrial testified that Janeide Reguiero, a pharmacy

technician at South Beach Pharmacy, told Ghabrial that Suzanne Burgos knew that

Reguiero was filling aerosol prescription vials with incorrect volumes of

medication. In light of the evidence establishing the substantial fraudulent aerosol

business ongoing at both La Moderna and South Beach Pharmacies,[11] the jury was

entitled to infer that Suzanne Burgos, a licensed pharmacist whom evidence

established was active in managing both the personnel and day-to-day activities of

both pharmacies, was a knowing participant in the fraudulent conspiracy.[12]

Similarly, the district court did not err by instructing the jury on deliberate

ignorance, as there was evidence to support an inference that Suzanne Burgos,

---

[11] Pharmacy technician Odalys Regil, who pled guilty and cooperated with the prosecution, testified that La Moderna Pharmacy would borrow aerosol medication from South Beach Pharmacy to fill the prescriptions and that she knew the medications she was helping dispense were not for actual use by patients because "the DME owners would brag about [the fraud]." Ghabrial's testimony underscored the cooperation between the Burgos' two pharmacies in filling the aerosol prescriptions for the DME companies, testifying that after La Moderna moved to a new location, the aerosol medications were no longer compounded or filled at La Moderna. Rather, the DME companies faxed prescriptions directly to South Beach, where medication was compounded, filled in boxes, and delivered to La Moderna for dispensal.

[12] Additionally, Carlos Gomez, a La Moderna pharmacy technician, testified that Burgos was active in supervising the compounding, even directing him to modify the formula. Regil testified to the sloppy compounding and dispensal methods at La Moderna, as discussed below, Section II.E. Although Regil testified that Michael Iheagwara was her primary managing pharmacist at La Moderna, Suzanne Burgos would occasionally substitute as managing pharmacist and, like Iheagwara, failed to supervise Regil's work supplying prescriptions for the DME companies. Finally, Suzanne Burgos' initials appear in La Moderna logs on numerous occasions as the dispensing pharmacist for aerosol medications.

13

through her role at South Beach and La Moderna Pharmacies, was aware of facts that should have put her on notice of the fraudulent activity, but deliberately insulated herself from positive knowledge. The district court did not abuse its discretion by admitting extrinsic evidence or by allowing Agent Cesar Arias to testify about his audit of La Moderna and South Beach Pharmacies, as the audit represented intrinsic evidence that the pharmacies had purported to sell more product during the time period of the conspiracy than the volume of supplies they purchased would have allowed.

As to Suzanne Burgos' sentence, the district court did not err in calculating the amount of loss attributable to Suzanne Burgos – in a jointly undertaken criminal activity, each defendant is responsible for "all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity." U.S.S.G. § 1B1.3(a)(1)(B).

## E. Micheal Iheagwara

Michael Iheagwara, a licensed pharmacist, incorporated two pharmacies that were allegedly involved in the fraud scheme, La Moderna and, later, Maz Pharmacy. He argues that his conviction for conspiracy must be vacated because the district court erred in finding that Rule 408 of the Federal Rules of Evidence

did not apply to criminal proceedings,[13] and thus erroneously admitted evidence arising from a state administrative complaint against him. The administrative complaint at issue was brought by the Florida Department of Health against Maz Pharmacy. In his representative capacity as an owner of Maz Pharmaceuticals, Inc., Iheagwara signed a statement in response to the complaint wherein he agreed to: (i) admit as true the drug-alteration allegations made in the administrative complaint; and (ii) permit the Department of Health to enter a fine and final order in order to avoid more formal administrative proceedings and the potential penalties arising therefrom. The district court overruled Iheagwara's objection to the admission of the statement, holding that Rule 408 did not bar its admission because Rule 408 does not apply to criminal proceedings.

Rule 408 provides that "[e]vidence of . . . furnishing . . . a valuable consideration in compromising or attempting to compromise a claim which was disputed as to either validity or amount, is not admissible to prove liability for or invalidity of the claim or its amount." Fed. R. Evid. 408. Our sister circuits are divided on the question of whether Rule 408 applies to criminal cases: the Second, Sixth, and Seventh Circuits have held that the Rule applies only in civil cases,

_____

[13] Iheagwara also argues that the district court erred at sentencing by departing upward under the sentencing guidelines and by ordering restitution so excessive as to violate the Eighth Amendment. We find no merit in either of these arguments.

15

while the Fifth and Tenth Circuits have held it applicable in both civil and criminal cases. Compare, Manko v. United States, 87 F.3d 50, 54-55 (2d Cir. 1996) (holding Rule 408 inapplicable in criminal cases), United States v. Logan, 250 F.3d 350, 367 (6th Cir. 2001) (same), and United States v. Prewitt, 34 F.3d 436, 439 (7th Cir. 1994) (same), with United States v. Hays, 872 F.2d 582, 588-59 (5th Cir. 1989) (holding that Rule 408 prevents the introduction of settlement agreements in a criminal proceeding) and United States v. Bailey, 327 F.3d 1141, 1146 (10th Cir. 2003) (same). While we note the division of eminent authorities on this issue, we are persuaded that Rule 408 applies to both criminal and civil proceedings.

First, the plain language of Rule 1101(b) renders each of the Federal Rules of Evidence – including Rule 408 – generally applicable to criminal cases and proceedings. Fed. R. Evid. 1101(b) ("These rules apply generally to civil actions and proceedings, including admiralty and maritime cases, [and] to criminal cases and proceedings . . . ."); see also, United States v. Meadows, 598 F.2d 984, 989 (5th Cir. 1979) ("[W]e assume the applicability of Rule 408 to govern the admission of related civil settlement negotiations in a criminal trial.").[14]

---

[14] In Bonnard v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all Fifth Circuit precedent handed down prior to the close of business on September 30, 1981.

16

Furthermore, where the drafters of the Rules intended to prevent the application of a particular Rule to criminal cases, they provided so expressly. See Bailey, 327 F.3d at 1146 n.6 (citing Fed. R. Evid. 803(8)(b) as indicating that "the drafters of the Rules knew how to expressly exclude criminal proceedings from the Rules' application when they wanted to . . . ."). Where the drafters of Rule 408 did not expressly preclude application of Rule 408 to criminal cases, we are reluctant to construe that decision as inadvertent. While some courts have read the Rule's use of the terms "claim" and "validity" to imply that Rule 408 was meant to apply only to civil cases, see, e.g., Prewitt, 34 F.3d at 439, we find the structure of the Rules and the express command of Rule 1101(b) more compelling.

Second, the last sentence of Rule 408 specifically states that the Rule "does not require exclusion when the evidence is offered for another purpose, such as . . . proving an effort to obstruct a criminal investigation or prosecution." Fed. R. Evid. 408. Indeed, the advisory committee's notes explain that evidence of "an effort to 'buy off' the prosecution or a prosecuting witness in a criminal case" provides one example of evidence that is generally subject to Rule 408, but that is rendered admissible by the Rule's last sentence. Fed. R. Evid. 408, advisory committee's note (1972 proposed rules) (emphasis added). If the drafters of Rule 408 intended the Rule to apply solely in civil cases, there would be no occasion to

17

carve out an exception for certain circumstances in criminal cases, much less to add an advisory note directly concerning the Rule's effect in criminal cases. See United States v. Skeddle, 176 F.R.D. 254, 257 (N.D. Ohio 1997); see also State v. Gano, 988 P.2d 1153, 1159 (Haw. 1999) (holding that parallel state rule of evidence applied to criminal cases, because "constru[ing] the rule as applying only in civil proceedings would render the final sentence of the rule unnecessary").

Third, applying Rule 408 to criminal cases furthers the policy interests that undergird the Rule. The advisory committee's notes clarify that there are two justifications for the exclusions that Rule 408 requires: (i) the evidence is irrelevant, as the compromise at issue may have been motivated by a desire for peace rather than any concession as to the merits of the party's position; and (ii) the exclusion promotes settlement of disputes. Fed. R. Evid. 408, advisory committee's note (1972 proposed rules). It is self-evident that a defendant in a civil suit is far less likely to offer to settle a claim if evidence of that offer can later be introduced to prove criminal liability for the same conduct. Limiting Rule 408 to civil proceedings thus undermines the public policy in favor of compromise that the Rule aims to further. Moreover, while the Second Circuit has found that the interest in accurate determinations in criminal trials outweighs the interest in promoting civil settlements, this rationale overlooks a basic premise

18

underlying Rule 408: evidence of compromise is not necessarily probative of liability. Indeed, the advisory committee's notes indicate that evidence of a settlement offer is often irrelevant to liability for the charged conduct, because "the [settlement] offer may be motivated by a desire for peace rather than from any concession of weakness of position." Fed. R. Evid. 408, advisory committee's note (1972 proposed rules). In this light, permitting the admission of civil settlement offers in subsequent criminal prosecutions actually compromises the accuracy of the jury's determination. As the Fifth Circuit explained, "[i]t does not tax the imagination to envision the juror who retires to deliberate with the notion that[,] if the defendants had done nothing wrong, they would not have paid the money back." United States v. Hays, 872 F.2d 582, 589 (5th Cir. 1989); see also, Bailey, 327 F.3d at 1145 (discussing "the dramatic effect [that] evidence of an admission of liability could have upon a criminal defendant"); Gano, 988 P.2d at 1159 ("[T]he potential impact of evidence regarding a civil settlement agreement is even more profound in criminal proceedings than it is in civil proceedings.").

For these reasons, we join the Fifth and Tenth Circuits in holding that Rule 408 applies to both civil and criminal proceedings. It follows that the evidence and testimony at issue was inadmissible under Rule 408, and that the district court

abused its discretion in admitting the evidence.[15]  See Koon v. United States, 518

U.S. 81, 100 (1996) ("A district court by definition abuses its discretion when it

makes an error of law.").

However, a non-constitutional error is harmless if, viewing the proceedings

in their entirety, a court determines that the error "did not affect the verdict, or had

but very slight effect."  See United States v. Magluta, 418 F.3d 1166, 1180 (11th

Cir. 2005) (internal marks omitted); see also Kotteakas v. United States, 328 U.S.

750, 762, 764 (1946).  Here, as we detail below, the government presented

overwhelming evidence of Iheagwara's knowledge of and participation in the

conspiracy.  Therefore, we find that the admission of Iheagwara's statement was

merely cumulative and did not affect the verdict.

The government presented evidence that Iheagwara incorporated both La

Moderna Pharmacy (a d/b/a for M&M Pharmacy), which he co-owned with

Marco Burgos, and Maz Pharmacy.  Pharmacy technician Odalys Regil, who pled

guilty and cooperated with the prosecution, testified that Iheagwara hired her to

work at La Moderna and trained her to compound the aerosol medication, and also

described La Moderna's standard procedures for compounding the aerosol

medication under Iheagwara's direction.  According to Regil, she and Iheagwara

---

[15] While Iheagwara argues for the first time on appeal that the evidence at issue also violates
Rule 403, we need not reach this issue, as our holding on Rule 408 grounds is dispositive.

20

did not accurately weigh the chemicals mixed in the compounds; haphazardly dispensed the medication into individual dosage vials, often ignoring the amount specified on the prescription; did not clean the machine used to dispense medication into individual vials, so that it developed a green fungus in the dispensing hoses; allowed a night crew to label the medication, unsupervised by a pharmacist; and would print dates on medication labels that did not match the actual date dispensed (as they should). The jury could reasonably conclude that these egregious violations indicate Iheagwara's knowledge that he was manufacturing and dispensing medication only to create a facade of legitimacy for the fraud scheme, and not to actually serve sick patients.

Additionally, Regil testified that while she worked at La Moderna, she and Iheagwara sold half portions of medicine to Jose Arias, and that the two also sold unaffixed labels to Jose Arias on the side, receiving a cash payment which they shared. Later, Regil and Iheagwara left La Moderna, at which point they opened a DME company to continue the scheme, and Iheagwara established Maz Pharmacy. Mercedes Jerez, who worked at Sunshine Medical DME and also pled guilty in the case, testified that Maz Pharmacy would sell Sunshine labels unaffixed to medication, as well as labels backdated by several months.

Special Agent Tony Illas testified that the compounding area at Maz

21

Pharmacy was "sloppy," "sticky," and "filthy." Illas also told the jury that Maz Pharmacy labels were seized pursuant to a search of J&A Billing,[16] and that the printed sheets contained prescription labels for patients from different months on the same sheet. These anomalous sheets provided evidence that the labels were not printed in conjunction with actual dispensations of medication to patients, but rather were generated simply to create an appearance of legitimacy in the records. Maz Pharmacy labels seized during a search of First Option Medical Center similarly included different months on the same printed sheet.

Additionally, Investigator Louis Collado testified that when they visited Maz Pharmacy, he found pre- and post-dated aerosol medication prepared for dispensal; the pharmaceutical orders contained only half the contents indicated on the labels. The testimony of Agent Cesar Arias corroborates Collado's testimony. Finally, while we have specifically described only the evidence implicating Iheagwara individually, we note that the government presented overwhelming evidence that a fraud conspiracy existed, generally. Because the substantial evidence incriminating Iheagwara assures us that the erroneous admission of the statement was harmless, we affirm Iheagwara's conviction and sentence.[17]

---

[16] J&A Billing submitted the DME companies' claims to Medicare.

[17] Iheagwara argues that because the district court instructed the jury that the settlement statement was admissible only against Iheagwara, and not Maz Pharmacy co-owners Magnus Ogbenna and Azubueze Ikejiani, the jury's acquittal of Ogbenna and Ikejiani alone demonstrates

22

## F. Pedro Sarduy

Pedro Sarduy, a medical doctor who worked at the Arias-owned First Option Medical Center, was convicted of conspiracy based on the government's allegations that he participated in the fraud scheme by certifying false diagnoses of COPD. Sarduy argues that the district court erred by refusing to instruct the jury on his defense of withdrawal from the conspiracy, because there was sufficient evidence to support the conclusion that he withdrew from the conspiracy more than five years before the government charged him. If the jury accepted his withdrawal defense, the statute of limitations would preclude conviction. Thus, he claims the district court erred by refusing to correctly

that the statement was harmful to Iheagwara's substantial rights. Our review of the record, however, indicates that Ogbenna and Ikejiani were not similarly situated, in terms of the evidence presented to the jury. Although they were co-owners of Maz Pharmacy, their similarity to Iheagwara ends there. Indeed, their co-ownership of Maz Pharmacy was virtually the only evidence implicating Ogbenna and Ikejiani. Regil testified that in her visits to Maz Pharmacy, "the only one I would actually see filling aerosol medications would be Michael [Iheagwara]." The government presented no evidence of personal knowledge or involvement by Ogbenna or Ikejiani. The evidence against Ikejiani and Ogbenna thus appears comparable to that presented against Reinaldo Landrove, who was also acquitted. This evidence did no more than establish that Ikejiani and Ogbenna were corporate officers for and were occasionally present at a business implicated in the fraud scheme, performing tasks such as compounding or delivering medicine that they could plausibly have executed with no personal knowledge of the underlying fraud.

More comparable to Iheagwara were Marco and Suzanne Burgos, co-owners of La Moderna. As with Iheagwara, the evidence demonstrated that the Burgos were active in day-to-day management of businesses involved in the fraud over the course of several years. There was testimony establishing that both Marco and Suzanne had specific knowledge of fraudulent activity, and were active participants. The jury's guilty verdicts for Marco and Suzanne, the evidence against whom was comparable to that against Iheagwara, bolsters our conclusion that the erroneous admission did not affect the jury's verdict on Iheagwara.

23

instruct the jury on this defense, and that his conviction must be reversed.

A criminal defendant has the right to a jury instruction on his theory of defense, separate and apart from instructions given on the elements of the charged offense. See Mathews v. United States, 485 U.S. 58, 63 (1988); United States v. Ruiz, 59 F.3d 1151, 1154 (11th Cir. 1995). If the proposed instruction presents a valid defense and there has been "some evidence" adduced at trial to support the defense, a trial court may not refuse to charge the jury on that defense. Ruiz, 59 F.3d at 1154. The burden of presenting evidence sufficient to support a jury instruction on a theory of defense is "extremely low." Id. "[T]he defendant is entitled to have presented instructions relating to a theory of defense for which there is any foundation in the evidence, even though the evidence may be weak, insufficient, inconsistent, or of doubtful credibility." United States v. Lively, 803 F.2d 1124, 1126 (11th Cir. 1986) (internal marks omitted). In reviewing the evidence adduced, the court must view the evidence in the light most favorable to the accused. Ruiz, 59 F.3d at 1154.

An accused conspirator's participation is presumed to have continued until all objects of the conspiracy have been accomplished or until the last overt act has been committed by any of the conspirators. United States v. Reed, 980 F.2d 1568, 1583 (11th Cir. 1993). However, if a conspirator establishes the affirmative

24

defense of withdrawal, the statute of limitations will begin to run at the time of withdrawal.[18]  Id. at 1584; see also United States v. U.S. Gypsum Co., 438 U.S. 422, 465 n.38 (1978).  Otherwise, the statute will not begin to run until the final act of the conspiracy has occurred.  Reed, 980 F.2d at 1584.

Because withdrawal constitutes a valid defense to the conspiracy charge, Sarduy was entitled to his requested instruction if there was "any foundation in the evidence" to demonstrate that he withdrew from the conspiracy more than five years before he was indicted.  See Ruiz, 59 F.3d at 1154.  Thus, Sarduy must demonstrate that the evidence provided a foundation to satisfy this circuit's two-prong test for withdrawal:  "first, the defendant must prove that he has taken affirmative steps to defeat the objectives of the conspiracy; and second, he must show either that he made a reasonable effort to communicate these acts to his co-

_____

[18] The government asserts that a conspirator cannot withdraw after an overt act has been committed.  First, we note under the offense charged here, the conspiracy does not exist until the commission of an overt act.  See 18 U.S.C. § 371.  Second, while we have stated that "withdrawal [from a conspiracy] is impossible once an overt act is committed," see United States v. Marolla, 766 F.2d 457, 461 (11th Cir. 1985), we clearly noted that "withdrawal is not altogether irrelevant" after the overt act, as "withdrawal precludes liability for acts occurring after the withdrawal." Id.  Thus, an effective withdrawal insulates the defendant from Pinkerton liability for the substantive crimes of co-conspirators committed in furtherance of the conspiracy after his withdrawal.  Finally, even though withdrawal will not absolve the defendant from liability for the inchoate crime of conspiracy, which is completed upon commission of an overt act, the statute of limitations for that charge will begin to run at the time of withdrawal.  Here, Sarduy's withdrawal from the conspiracy did not absolve him of criminal liability for the conspiracy charge.  However, the subsequent running of the statute of limitations for that prior participation would preclude the government from prosecuting him for those acts.  See 18 U.S.C. § 3282(a); United States v. Read, 658 F.2d 1225, 1232-33 (7th Cir. 1980) ("Withdrawal becomes a complete defense only when coupled with the defense of the statute of limitations.").

conspirators or disclosed the scheme to law enforcement authorities. United States v. Young, 39 F.3d 1561, 1571 (11th Cir. 1994). Mere cessation of participation is not sufficient to establish withdrawal; the accused must also establish that he communicated his withdrawal either to his co-conspirators or to law enforcement. See United States v. Finestone, 816 F.2d 583, 589 (11th Cir. 1987). The accused participant is not required to notify "each other member" that he will no longer participate, but the acts of withdrawal must be "communicated in a manner reasonably calculated to reach co-conspirators." See United States v. U.S. Gypsum Co., 438 U.S. 422, 464-65 (1978).

Sarduy argues that the evidence provides a sufficient foundation for a jury to infer that he had withdrawn from the conspiracy, and that withdrawal had been communicated to Jose Arias, the head of the scheme. First, he presents an August 28, 1995 letter to Blue Cross/Blue Shield, as administrator for Medicare Part B, wherein he advised them that he was no longer seeing patients at First Option, and requested his cancellation as provider at First Option.[19] Sarduy's expert testified that a physician could reasonably assume that by notifying Medicare that he was no longer working for a particular clinic, Medicare would notify any other

---

[19] Sarduy also notes the testimony of government witness Adolfo Baron, a former physician's assistant at First Option, who testified that Sarduy departed First Option during the first half of 1995.

participating providers. Citing this expert testimony, Sarduy argues that the letter to Blue Cross/Blue Shield therefore constituted a communication "reasonably calculated" to reach Jose Arias, the scheme's principal.

Additional evidence indicates that his communication of withdrawal was indeed successful, bolstering his claim. Days after he mailed the August 28, 1995 letter to Blue Cross/Blue Shield, his name was crossed out from the list of individual provider numbers on First Option Medical Center's Medicare electronic billing enrollment form.[20] Further, checks submitted by the government, as well as a chart of those checks submitted into evidence by the government, illustrate that the checks purportedly paying Sarduy for his involvement in the scheme cease in September 1995. Finally, Sarduy argues that testimony by his former office manager stating that Jose Arias acquired a subsequent October 16th "To whom it may concern" letter from Sarduy, in which Sarduy wrote that "I will be providing medical services at First Option Medical Center," indicated that Arias had actually received Sarduy's communicated withdrawal (in the August 28th letter), and was attempting to engage Sarduy's continued participation. After this October exchange, a final December 4, 1995 letter to Blue Cross/Blue Shield again requests Sarduy's cancellation as a provider

---

[20] These forms were signed by convicted co-conspirator Idania Arias.

for First Option, and advises Blue Cross/Blue Shield that he had not seen any patients since sending the previous cancellation letter in August.

Viewing this evidence in the light most favorable to Sarduy, see Ruiz, 59 F.3d at 1154, and in light of the "extremely low" burden that Sarduy must meet, id., we find that he has provided a sufficient foundation in the evidence from which a jury could conclude that he took affirmative steps to withdraw from the conspiracy and to communicate that withdrawal to his co-conspirators. Because Sarduy adduced evidence supporting his valid theory of defense, he was entitled to the jury instruction he requested. The district court's erroneous refusal to charge the jury as requested mandates that we vacate Sarduy's conviction.

## CONCLUSION

Having considered the record and argument of counsel, we find no reversible error as to Grisel Arias, Marco Burgos, Suzanne Burgos, Idania C. Arias, Dalia Landrove, or Michael Iheagwara, and affirm their convictions and sentences. However, for the reasons set out above, we vacate the conviction and sentence of Pedro Sarduy and remand for a new trial.

**AFFIRMED in part VACATED in part.**