[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 16-17347

_____

D.C. Docket No. 1:14-cr-20323-CMA-4

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

versus

TIFFANY FOSTER,
a.k.a. Tiffany Coleman,
a.k.a. Tiffany Lee,
a.k.a. Tiffany Smith,
a.k.a. Tiffany Coleman Smith,

Defendant - Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(January 8, 2019)

Before MARTIN, JORDAN and WALKER,[*] Circuit Judges.

PER CURIAM:

A jury convicted Tiffany Foster of charges involving patient recruiting and illegal kickbacks in a health-care fraud scheme. *See* 18 U.S.C. §§ 1349, 371. The district court granted her motion for judgment of acquittal, *see* Fed. R. Crim. P. 29(c), ruling that she had withdrawn from the scheme more than five years before the date of the indictment (which was in May of 2014). *See United States v. Foster*, 103 F.Supp.3d 1335, 1340-43 (S.D. Fla. 2015). The government appealed, and we reversed, holding that a reasonable jury could have found that Ms. Foster did not withdraw from the scheme more than five years prior to her indictment. *See United States v. Foster*, 668 F.App'x 881, 881-82 (11th Cir. 2016). On remand, the district court sentenced Ms. Foster to 97 months of imprisonment. *See* D.E. 508 at 2.

Ms. Foster now appeals her conviction. She argues that government counsel engaged in misconduct during his cross-examination of her only witness by referencing the convictions of co-defendants, implying knowledge of facts not in evidence, inserting his own personal opinion regarding the witness' credibility, and placing the imprimatur of a federal judge on his personal evaluation of the witness.

---

[*] Honorable John M. Walker, Jr., United States Circuit Judge for the Second Circuit, sitting by designation.

2

After review of the briefs and extensive trial record, and with the benefit of oral argument, we agree with Ms. Foster that government counsel improperly inserted his own personal opinion regarding the defense witness' credibility into the proceedings, and improperly placed the imprimatur of a magistrate judge on his own personal evaluation of the witness. We conclude, however, that the error was not prejudicial to Ms. Foster given the witness' limited testimony. As a result, we affirm.

## I

Testimony at trial established that, to receive Medicare benefits for inpatient psychiatric services, beneficiaries must have a need for 24-hour medical supervision due to a mental disorder. *See* D.E. 351 at 196, 198-99. Medicare beneficiaries have a lifetime maximum of 190 days' coverage for inpatient psychiatric services. *See* 42 C.F.R. § 409.62.

Hollywood Pavilion operated a facility that, among other things, billed Medicare for inpatient psychiatric services. Hollywood Pavilion and several of its high-level employees, including Chief Executive Officer Karen Kallen-Zury, engaged in a scheme to defraud Medicare by submitting bills for beneficiaries who did not satisfy the requirements for inpatient psychiatric services. Hollywood Pavilion relied on patient recruiters like Ms. Foster to illegally refer patients in exchange for money.

3

**A**

Ms. Foster does not challenge the sufficiency of the evidence demonstrating the charged offenses or conspiracies centering around Hollywood Pavilion. She also does not contest the evidence showing her membership in the charged schemes until September of 2005. *See* Br. for Appellant at 3.

The crucial jury issue in Ms. Foster's case was whether she withdrew from the conspiracy before the five-year statute of limitations period. *See* 18 U.S.C. § 3282(a). In support of her withdrawal defense, Ms. Foster introduced evidence of conduct she claimed demonstrated withdrawal.

First, Ms. Foster resigned from Hollywood Pavilion on September 13, 2005, by faxing a letter of resignation to Ms. Kallen-Zury. The government tried to counter the resignation with evidence that Ms. Foster severed ties with Hollywood Pavilion because her pay was reduced and because she could make more money elsewhere.

Second, Ms. Foster elicited testimony from Andres Durango, an FBI special agent who testified for the government, about statements she made to federal authorities. Agent Durango testified that Ms. Foster disclosed the Hollywood Pavilion scheme to the FBI in March of 2009 during an interview. Agent Durango further testified that Ms. Foster informed him that Hollywood Pavilion had engaged in illegal conduct, including "recycling clients," "assess[ing] the same person numerous times within a month," "billing Medicare for services that [were] not

4

provided," "threaten[ing] some clients of withholding their disability checks if they did not return within 30 days," and providing improper brokerage contracts between Hollywood Pavilion and patient brokers. *See* D.E. 351 at 121-26. The government attempted to show that Ms. Foster did not provide the agents with any inculpatory statements and that she misled them in many ways.

Third, Ms. Foster called Aaron Danzig—who had already testified on behalf of a co-defendant—as her only witness. Mr. Danzig, an attorney in private practice, had been an Assistant U.S. Attorney. He and his firm had been retained to defend Hollywood Pavilion and Ms. Kallen-Zury against potential federal criminal charges. Mr. Danzig explained that his firm investigated the alleged Hollywood Pavilion kickback scheme and tried to convince government officials that criminal charges were inappropriate. Mr. Danzig testified that he called Ms. Foster in the fall of 2008 to request her assistance with his internal investigation. He recounted that Ms. Foster refused to assist him in any manner because she "hated Karen Kallen-Zury" and because "working for her was like Nightmare on Elm Street Part III." D.E. 358 at 52.

## B

On cross-examination, the prosecutor tried to impugn Mr. Danzig's integrity and credibility in a number of ways. Because they bear on our analysis, we set out the prosecutor's questions and Mr. Danzig's answers in detail.

5

First, the prosecutor suggested through questions that Mr. Danzig had not told certain Hollywood Pavilion employees (as he was required to do) that he was representing the company and had improperly implied that he could and did represent them in an individual capacity. *See id.* at 56-64. Mr. Danzig said that he had told one employee (but not others) that he was representing the company and admitted that he had told at least one employee that he could represent her individually in responding to the FBI's request for an interview. *See id.* at 59-63.

Second, the prosecutor suggested that Mr. Danzig had obstructed justice by telling a number of Hollywood Pavilion employees that they should not speak to the FBI. *See id.* at 59-62. Mr. Danzig denied doing any such thing, explaining that he told the employees that it was their decision as to whether to speak to the FBI. *See id.*

Third, the prosecutor suggested that Mr. Danzig had—in violation of the attorney-client privilege—improperly turned over to the Department of Justice statements that one Hollywood Pavilion employee (the one whom he told he could represent her individually) had made. Mr. Danzig admitted turning over some of the employee's statements, but denied that he had violated the attorney-client privilege. *See id.* at 63-64.

Fourth, the prosecutor suggested that Mr. Danzig had been told by some witnesses that Hollywood Pavilion was paying recruiters to refer patients. Mr.

6

Danzig, however, denied that he had received such information, and rejected any accusation that he had written false reports of his interviews with witnesses. *See id.* at 65-66.

Fifth, the prosecutor suggested that Mr. Danzig and his clients had failed to produce documents requested by subpoenas issued by the Inspector General of Health and Human Services. Mr. Danzig explained that prior counsel was responsible for gathering documents that were responsive to the subpoena, and that by the time he started searching for such documents, the government executed a search warrant at Hollywood Pavilion and took everything. *See id.* at 64-68. In a set of related questions, the prosecutor suggested that Mr. Danzig and his clients also failed to turn over all responsive documents requested by grand jury subpoenas. Mr. Danzig acknowledged that some documents may not have been turned over, but said that he was unaware of their existence at the time. *See id.* at 71-74.

Sixth, the prosecutor suggested that Mr. Danzig had violated an order of a magistrate judge. The prosecutor asked Mr. Danzig if he was present at Ms. Kallen-Zury's pretrial detention hearing before a magistrate judge (who was, of course, not presiding over Ms. Foster's criminal trial), and whether the magistrate judge had told Ms. Kallen-Zury not to have contact with any Hollywood Pavilion employees. Mr. Danzig said he was present and remembered the admonition. *See id.* at 74. The prosecutor then asked Mr. Danzig if he and Ms. Kallen-Zury had met with a

Hollywood Pavilion employee two weeks later. Mr. Danzig answered affirmatively but explained that the meeting did not violate the magistrate judge's order because the employee's attorney knew about the meeting. *See id.*[1]

Seventh, the prosecutor suggested that Mr. Danzig was covering up criminal conduct. The prosecutor asked Mr. Danzig if he had recommended to the Department of Justice that it should not commence any criminal prosecutions against Hollywood Pavilion and Ms. Kallen-Zury. When Mr. Danzig said he had done so in an attempt to zealously represent and advocate on behalf of his clients, the prosecutor then asked him whether he was aware that "multiple people have been convicted who worked at Hollywood Pavilion[.]" *Id.* at 80. Ms. Foster objected on relevance grounds, and a co-defendant requested a curative instruction. *See id.* Before Mr. Danzig could answer the question, the district court asked for the jury to be excused for its morning recess and heard argument from counsel about the question. During the discussion, the prosecutor and the district court pointed out that the jury already knew, through other testimony, that Ms. Kallen-Zury and others had already been convicted for their roles in the scheme. *See id.* at 83-85. At the end, the district court asked the prosecutor to rephrase his question to Mr. Danzig. *See id.* at 85, 88.

---

[1] Up to this point, Ms. Foster did not object to these questions in terms of substance. There were some objections, but they were generally in the nature of requesting that Mr. Danzig be allowed to answer the questions posed to him.

After the recess, the prosecutor asked Mr. Danzig whether his investigation of Hollywood Pavilion had been thorough and complete.  Mr. Danzig responded that he and his firm had done what they believed was necessary to respond to the government's concerns and make a convincing argument that civil and criminal charges should not be pursued.  *See id.* at 91-92.  The prosecutor, over defense objections, then asked Mr. Danzig if subsequent guilty pleas would change his mind about the investigation being thorough and complete.  He said that he was not sure, and that "the fact that someone was convicted" did not "negate[ ] the work that we did[.]"  *Id.* at 92.

The prosecutor then questioned Mr. Danzig about his statement in a letter to the government that a man named Keith Humes was never paid kickbacks to send patients to Hollywood Pavilion.  Mr. Danzig acknowledged that Mr. Humes had pled guilty and was cooperating with the government.  *See id.* at 94-95.  When the prosecutor asked Mr. Danzig if he got it wrong, Ms. Foster objected and reserved a motion.  The district court denied the motion.  *See id.* at 95.

The cross-examination then turned to a meeting with DOJ attorneys in Washington, D.C., in January of 2013.  An FBI agent—Agent David Ceron—was also in attendance.  The prosecutor asked Mr. Danzig if the purpose of having an agent at the meeting was for the purpose of having that agent testify later if a person at the meeting made false statements.  Mr. Danzig agreed that this was a reason to

9

have an agent at a meeting. *See id.* at 97-98. Not satisfied, the prosecutor then asked Mr. Danzig if he knew that an agent was at that meeting "to make sure that the statements you [Mr. Danzig] made during that meeting were truthful and accurate[.]" Mr. Danzig responded that the meeting was held because DOJ attorneys had falsely accused him and his firm of obstruction of justice in a letter. Mr. Danzig and his firm asked for the meeting to speak to a supervisor. *See id.* at 98-100. When the prosecutor asked Mr. Danzig again whether he knew that the agent was there "to memorialize and be a witness to further false statements that you [Mr. Danzig] made in obstruction of justice," Mr. Danzig said he did not know. *See id.* at 99.

At that point the cross-examination ended.

On redirect examination by counsel for a co-defendant, Mr. Danzig explained that Ms. Kallen-Zury obtained separate counsel when the government indicated it might pursue criminal charges against her, that clients had not always told him the entire truth, and that attorneys act as advocates for their clients and try to present the facts in the "best possible light," and discussed some of the letters he wrote to DOJ (including one in which he stated that Mr. Humes' activities might fit within certain exemptions under federal law). *See id.* at 103, 106, 112, 113-19.

On redirect examination from Ms. Foster, Mr. Danzig testified that he had gone to Harvard and taught in a public school, and that he had taken a pay cut to go to the U.S. Attorney's Office from private practice. *See id.* at 121-22. He also

explained that the HHS subpoenas had been issued at a time when prior counsel represented Hollywood Pavilion, that he and his firm did not duplicate all of the work that prior counsel had done because it would have been prohibitively expensive, and that his firm was negotiating with DOJ about some subpoenas when the search warrant was executed (and therefore he did not have the chance to produce the requested documents). *See id.* at 122-26. After a sidebar discussion, Mr. Danzig, in response to a series of questions from Ms. Foster, testified that he and his firm did not obstruct justice or tell employees of Hollywood Pavilion not to speak to the FBI, and that it was the employees' decision as to whether to speak to the FBI. *See id.* at 130-31. Mr. Danzig also said that the heavy-handed tactics of the government would probably scare people not familiar with the legal system. *See id.* at 132. Finally, Mr. Danzig said he was telling the truth when he testified that Ms. Foster would not help him when he called her in 2008 because she hated Ms. Kallen-Zury. *See id.* at 133.

Following another sidebar, in which the government asked for permission to conduct recross-examination, the district court instructed the jury as follows: "The fact, ladies and gentlemen, that other witnesses may have pleaded guilty or been found guilty of an offense is not evidence of the guilt of any other person." *Id.* at 135.

11

On recross, Mr. Danzig said that, at a pretrial conference for Ms. Kallen-Zury's criminal case, the prosecutor had made statements about him (concerning the subpoena and suggesting obstruction) that were false. *See id.* at 137. The prosecutor then followed up with this question: "And the court in that case [the magistrate judge] did not dispute the allegations that I made about your obstruction, did they, at that time?" *Id.* Mr. Danzig explained that he had not been in court to be able to respond. *Id.* Ms. Foster objected, on the ground that the magistrate judge was not adjudicating any possible obstruction issues at the hearing, but the district court overruled the objection. *Id.* Mr. Danzig again explained that he "wasn't present in the courtroom to respond." *Id.* at 138. The prosecutor doubled down on the issue, asking this follow-up question: "[B]ut you know it happened because you ended up coming down to Miami, and the [c]ourt wanted further investigation into your obstruction after my comments about it to the [c]ourt, correct?" *Id.* Mr. Danzig replied: "No. I don't believe the [c]ourt wanted further investigation. You made false statements regarding the subpoena issue[.]" *Id.* Undaunted, the prosecutor pressed ahead again: "Mr. Danzig, the fact that the [c]ourt entertained that discussion and had follow-up shows that my allegations of your obstruction, which you object to, were not demonstrably false, correct?" Ms. Foster objected, the district court sustained the objection, and Mr. Danzig did not answer the question. *See id.* With that, Mr. Danzig's testimony ended.

12

## II

We generally review claims of prosecutorial misconduct *de novo*. *See United States v. Eckhardt*, 466 F.3d 938, 947 (11th Cir. 2006).  To prevail on her claim, Ms. Foster must show that the prosecutor made improper remarks that prejudicially affected her substantial rights.  *See United States v. Eyster*, 948 F.2d 1196, 1206 (11th Cir. 1991).  "A defendant's substantial rights are prejudicially affected when a reasonable probability arises that, but for the remarks, the outcome of the trial would be different." *United States v. Osmakac*, 868 F.3d 937, 957 (11th Cir. 2017). A "reasonable probability is a probability sufficient to undermine confidence in the outcome."  *Eyster*, 948 F.2d at 1207 (internal citation and quotations omitted)

## III

Ms. Foster urges us to reverse her conviction based on the prosecutor's inappropriate cross-examination of Mr. Danzig.  According to Ms. Foster, the prosecutor's questions were improper because they relied on evidence not before the jury, and because they placed the veracity of the prosecutor and the imprimatur of a magistrate judge in another proceeding against the credibility of Mr. Danzig.  Ms. Foster asserts that this misconduct affected her substantial rights because Mr. Danzig's testimony was central to her withdrawal defense. According to Ms. Foster, Mr. Danzig's testimony that she refused to assist co-conspirators in their defense against potential criminal charges was itself an act of withdrawal, which, if believed,

13

corroborated her 2005 resignation from Hollywood Pavilion and her 2009 interview with the FBI as acts of withdrawal. Ms. Foster asserts that the government's improper cross-examination of Mr. Danzig was the entirety of the government's challenge to her second instance of withdrawal.

The government responds that the prosecutor acted properly because defense counsel had opened the door to this line of questioning, and because the prosecutor had a good faith factual basis to inquire about possible obstruction. The government contends that such examination was permissible because it was meant to undermine Mr. Danzig's credibility. The government also argues that any error was harmless because Mr. Danzig's testimony was insufficient to establish withdrawal and added little, if any, support for Ms. Foster's other theories of withdrawal. Finally, the government argues that any potential error was remedied by the district court's jury instruction that "anything the lawyers say is not evidence[.]" D.E. 336 at 2.

## A

It is expected that the government will try to impeach a defense witness and, in doing so, may sometimes ask the witness about involvement in improper or illegal behavior. For example, it was appropriate for the prosecutor here to ask Mr. Danzig about documents that he did not produce that were responsive to a grand jury subpoena, to challenge Mr. Danzig's opinion that a criminal investigation into

14

Hollywood Pavilion was not warranted, and to question Mr. Danzig about possible obstructive behavior.  The prosecutor crossed the line, however, in several respects.

First, the prosecutor stated that an FBI agent attended a meeting to document Mr. Danzig's false statements and obstruction.  The prosecutor asked Mr. Danzig whether he knew that the agent was present "to memorialize and be a witness to further false statements that you [Mr. Danzig] made in obstruction of justice." D.E. 358 at 99.  This was inappropriate.  It is improper for a prosecutor to "make[ ] a statement which could be construed by the jury as implying that he has additional reasons for knowing" whether a witness is telling the truth or not.  *See United States v. Lamerson*, 457 F.2d 371, 372 (5th Cir. 1972).

Second, the prosecutor asked Mr. Danzig whether a magistrate judge "did not dispute the allegations that I made about your obstruction[.]"  D.E. 358 at 137.   In effect, the prosecutor alluded to evidence that was not before the jury—a magistrate judge's purported view of the government's accusations—to bolster his personal opinion that Mr. Danzig was lying and had, in fact, committed obstruction.   This too was improper.  *See, e.g., Hall v. United States*, 419 F.2d 582, 586–87 (5th Cir. 1969) (holding that a prosecutor providing his opinion regarding a witness' integrity is improper).  As the Supreme Court has observed, a "prosecutor's opinion carries with it the imprimatur of the Government and may induce the jury to trust the Government's judgment rather than its own view of the evidence."  *United States v.*

15

*Young*, 470 U.S. 1, 18–19 (1985).   By stating that he had personally accused Mr. Danzig of obstruction in a separate proceeding and suggesting that he (the prosecutor) had correctly assessed Mr. Danzig's conduct, the prosecutor acted improperly.  *Cf. Eyster*, 948 F.2d at 1207 (concluding that prosecutor committed misconduct by vouching for a government witness in suggesting that inconsistencies in the witness' testimony could be explained by a typographical error where there was no evidence to support that theory).

Third, the prosecutor went even further, placing the imprimatur of a magistrate judge on his accusations of obstruction against Mr. Danzig.  Several times in his questions on recross-examination, the prosecutor stated that a magistrate judge had found credible his accusations of obstruction against Mr. Danzig.  For example, the prosecutor said that the judge "wanted further investigation into [Mr. Danzig's] obstruction."  D.E. 358 at 138.  The prosecutor not only injected his personal beliefs about Mr. Danzig's credibility into the trial, but he also used the asserted opinion of a magistrate judge—on which no admissible evidence was presented—to bolster his own accusations against Mr. Danzig.  We agree with our sister circuits that invoking the authority of a judge to further tip the scales in favor of the prosecutor's credibility or the government's case is improper.  *See United States v. Melendez*, 57 F.3d 238, 240–41 (2d Cir. 1995) (holding that it is clearly improper for the government to state that the trial judge knows that a cooperating witness is telling the truth); *United*

16

*States v. Harlow*, 444 F.3d 1255, 1266 (10th Cir. 2006) (holding that it is improper for the government to argue that a judge signed an order approving a sentence reduction of a cooperating witness and therefore personally approved the credibility of the witness); *United States v. Smith*, 962 F.2d 923, 934 (9th Cir. 1992) (holding that it is improper for a prosecutor to align himself with the court to bolster the credibility of the government and its witnesses).

That the defense may have opened the door to some lines of inquiry, or that the prosecutor may have had a good faith factual basis to inquire about possible obstruction, is not determinative. Opening the door to a line of cross-examination—for example, the thoroughness of Mr. Danzig's internal investigation—is not a license to engage in improper conduct. Similarly, we reject the government's argument that the questions were permissible because they implicated the Mr. Danzig's credibility rather than Ms. Foster's guilt. *See United States v. Crutchfield*, 26 F.3d 1098, 1101, 1103 (11th Cir. 1994) (reversing conviction based, in part, on improper impeachment of defense witness). As a defense witness, Mr. Danzig was called to provide testimony to support Ms. Foster's withdrawal defense. Improper attacks on a defense witness' credibility may, in some situations, strike at the jugular of the defense's case. *See Davis v. Zant*, 36 F.3d 1538, 1550 n.17 (11th Cir. 1994) ("[P]rosecutorial misconduct is least acceptable under the Constitution when aimed [at] the core of the defense's case.").

17

**B**

The next step in our analysis requires us to determine whether the improper remarks affected Ms. Foster's substantial rights. We make this determination in the context of the entire trial and in light of curative instructions. *See Osmakac*, 868 F.3d at 957. We consider (1) the degree to which the challenged remarks have a tendency to mislead the jury and to prejudice the accused, (2) whether they are isolated or extensive, (3) whether they were deliberately or accidentally placed before the jury, and (4) the strength of the competent proof to establish the guilt of the accused. *See Davis*, 36 F.3d at 1549.

Ms. Foster asserts that the improper statements by the prosecutor unfairly prejudiced her withdrawal defense and warrant a new trial. "Upon joining a criminal conspiracy, a defendant's membership in the ongoing unlawful scheme continues until [s]he withdraws." *United States v. Bergman,* 852 F.3d 1046, 1061 (11th Cir. 2017) (internal quotations omitted). To establish a withdrawal defense, "the defendant must prove that [s]he undertook affirmative steps, inconsistent with the objects of the conspiracy, *to disavow or to defeat* the conspiratorial objectives, *and* either communicated those acts in a manner reasonably calculated to reach h[er] co-conspirators or disclosed the illegal scheme to law enforcement authorities." *Id.* at 1061–62 (emphasis in original) (internal quotations omitted). Merely ending

18

participation in a conspiracy is not enough to establish the defense of withdrawal. *See id.* at 1062.

On balance, we conclude that the prosecutor's improper comments did not prejudicially affect Ms. Foster's substantial right to a withdrawal defense. There is no doubt that Mr. Danzig supported Ms. Foster's withdrawal defense; he testified that she refused to cooperate with his internal investigation of Hollywood Pavilion when he called her in 2008. *See United States v. Arias*, 431 F.3d 1327, 1341 (11th Cir. 2005) (holding that notification of withdrawal from a conspiracy can be made in appropriate circumstances through a third-party if it is reasonably calculated to reach members of the conspiracy). But Mr. Danzig explained that Ms. Foster told him that she did not want to help because she hated Ms. Kallen-Zury. Given that explanation by Ms. Foster, the jury could have seen her refusal to cooperate as based on a personality conflict and individual animus as opposed to disassociation with the illegal schemes at Hollywood Pavilion. As the government puts it, Ms. Foster's refusal to cooperate was "ambiguous at best." Br. for Appellee at 27. This conflicting testimony from Mr. Danzig, coupled with the additional fact that, as we determined in Ms. Foster's prior appeal, "there was substantial evidence from which a reasonable jury could find that Foster had not withdrawn from the conspiracies more than five years before the indictment," *Foster*, 668 F.App'x at 882, provides no basis for us to disturb the judgment of the district court. Mr. Danzig's testimony,

while it lent some support to Ms. Foster's withdrawal defense, did not establish it.

Thus, it is highly unlikely that the improper remarks by the prosecutor "misled the

jury" or actually "prejudice[d] the accused." *Davis*, 36 F.3d at 1549.[2]


## IV

Ms. Foster's convictions are affirmed.

**AFFIRMED.**

---

[2]Ms. Foster also argues that the government improperly asked some of the testifying co-defendants/co-conspirators themselves about their guilty pleas related to health care fraud and kickbacks at Hollywood Pavilion. Ms. Foster did not object when those questions were asked, so our review is for plain error. *See United States v. Sosa*, 777 F.3d 1279, 1294 (11th Cir. 2015). Our review leads us to conclude that there is no plain error. Although a co-defendant's guilty plea cannot be used as substantive evidence of another's guilt, the government may disclose the guilty pleas of testifying witnesses to blunt the impact of expected attacks on their credibility. *Compare United States v. King*, 505 F.2d 602, 607 (5th Cir. 1974), *with United States v. Countryman*, 758 F.2d 574, 577–78 (11th Cir. 1985). Moreover, the guilty plea of one co-defendant (Mr. Humes) was brought out by counsel for one of the co-defendants during the cross-examination of a case agent. Finally, the district court instructed the jury several times that the guilty plea of one person is not evidence of the guilt of anyone else. *See United States v. Carrazana*, 921 F.2d 1557, 1568 (11th Cir. 1991) ("In the absence of aggravated circumstances, a cautionary instruction directing the jury not to consider a guilty plea as substantive evidence of guilt will sufficiently cure any potential for prejudice to the defendant on trial").