[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 14-14990

_____

D.C. Docket No. 1:14-cr-20052-JEM-2

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

versus

ROGER BERGMAN,
RODOLFO SANTAYA,

Defendants - Appellants.

_____

Appeals from the United States District Court
for the Southern District of Florida

_____

(March 24, 2017)

Before HULL, MARTIN and EBEL,[*] Circuit Judges.

HULL, Circuit Judge:

Defendant Roger Bergman was a licensed physician's assistant employed by American Therapeutic Corporation ("ATC"). In late 2003, Bergman joined ATC and worked in ATC's Miami and Homestead clinics until late August 2008. Defendant Rodolfo Santaya also worked for ATC from February 2006 until the government closed ATC in October 2010. Santaya served as a patient recruiter.

Following a trial, a jury convicted defendant Bergman of (1) conspiracy to commit health care and wire fraud and (2) conspiracy to make false statements relating to health care matters. The jury convicted defendant Santaya of (1) conspiracy to commit health care and wire fraud, (2) conspiracy to pay and receive bribes and kickbacks in connection with a federal health care benefit program, and (3) receipt of bribes and kickbacks in connection with a federal health care benefit program. Both defendants appeal their convictions and sentences. After thorough review of the briefs and the entire record, and with the benefit of oral argument, we affirm.

---

[*]Honorable David M. Ebel, United States Circuit Judge for the Tenth Circuit, sitting by designation.

2

## I.    FACTUAL BACKGROUND

Because the defendants challenge the sufficiency of the evidence supporting their convictions, we outline the trial evidence in the light most favorable to the government.

## A.    Partial Hospitalization Programs

Marianella Valera, a therapist, opened ATC on June 1, 2000.  In December 2002, Valera started a Partial Hospitalization Program ("PHP") through ATC.  A PHP serves as a bridge between inpatient and outpatient care for patients with a psychiatric condition severe enough to possibly require hospitalization.  A patient can be sent to a PHP either (1) from outpatient treatment because their provider has concerns about the patient but wants to keep them out of an inpatient stay, or (2) from inpatient treatment when the patient is improving but is not yet well enough to receive only routine outpatient care.  PHPs treat patients suffering from a wide variety of mental illnesses, most commonly major depressive disorder, schizophrenia, and bipolar disorder.  PHP treatment is inappropriate for those with impairments that would restrict their ability to participate in the program, such as those with memory and cognition impairment caused by Alzheimer's disease or those with substance abuse problems.

Community mental health centers ("CMHCs"), such as ATC, administer PHPs, which offer intensive outpatient psychiatric care including individual or

3

group psychotherapy, counseling, psychiatric diagnostic testing, and other mental health services. Patients generally stay in a PHP for two to three weeks and receive at least twenty hours of treatment per week. Staff at a PHP includes psychiatrists as well various other professionals, including nurses, nurse practitioners, physician's assistants, occupational therapists, physical therapists, and social workers.

## B.    ATC's Operations

Valera founded and owned ATC, which developed into an extensive Medicare scam. Valera gave her boyfriend, Larry Duran, the task of overseeing the business and operations end of ATC's PHPs. From 2003, when ATC received its first provider number, to 2010, when the government shut down the operation, ATC billed Medicare for approximately $200 million in claims, and Medicare paid over $85 million back to ATC.

In order to bill Medicare, ATC needed patients. ATC admitted patients to its PHP who had Alzheimer's, dementia, and substance abuse problems. ATC also admitted patients who were essentially healthy but wanted to leave their assisted living facilities, and ATC paid them to do so. The ATC patients with issues such as Alzheimer's and dementia often were not oriented to time or place, did not know where they were, and would confuse staff with their relatives.

4

ATC did have some patients who needed psychiatric help and qualified for the services ATC purported to provide. ATC, however, did not provide the individualized treatment required by Medicare. The doctors at ATC did not do much of anything and rarely came in. When they did come, they signed notes and saw patients but did not treat them. Mainly, the doctors just signed the documentation that other staff prepared for them in order to legitimize the treatment billed to Medicare. Some days there was no doctor at the facility, even though admissions occurred every day and a doctor ought to have been present to admit a patient.

Typically, ATC treated patients for four to eight weeks, depending on the maximum benefits that Medicare would pay. Valera, and not the doctors, decided how long each patient would receive treatment, and she told her medical directors to discharge patients at six weeks to avoid scrutiny from Medicare. ATC also recycled patients after a discharge, by readmitting them when Medicare would pay their benefits again. ATC believed patients needed to stay out of the PHP for ninety days without any bills to Medicare before Medicare would pay for further PHP services. After ninety days, either the referral source would call ATC and bring the patient back, or ATC would call the referral source in order to have the patient brought back. These returns were not based on the medical needs of the patients but on the ability to bill Medicare for additional treatment. If a patient did

5

not want to stay at ATC, either ATC would persuade the patient to stay or ATC would ask the referral source to persuade the patient to stay.

## C.    ATC's Billing of Medicare

ATC began paying for patient referrals and asked for only Medicare patients because Medicare did not require preauthorization and would pay claims within two weeks.  Because of the sheer volume of claims Medicare receives, Medicare is unable to review every claim submitted.  Indeed, Medicare reviews less than one or two percent of the submitted claims before paying them.  As a result, Medicare relies on providers to submit only legitimate and properly documented claims. ATC targeted Medicare patients and submitted false, exaggerated medical records to substantiate the claims it billed to Medicare.  Oftentimes, all the necessary documents were not even completed when the claims were submitted, and the documents were completed later in case Medicare audited ATC.

Generally, Medicare's standards allow reimbursement only for PHP treatment that is (1) provided to a legitimately enrolled Medicare beneficiary, (2) furnished by a licensed provider properly enrolled in the Medicare program, (3) actually furnished, (4) medically necessary, and (5) appropriately documented by the medical records.  Medicare provides to CMHCs a Local Coverage Determination ("LCD") document, which contains guidelines to follow in order to bill properly for PHP services.

6

During the time relevant to this case, the LCD applicable to Florida provided that Medicare would not pay for, among other things: (1) treatments for patients who are psychiatrically stable, (2) group therapy that is not individualized, and (3) treatments to patients who cannot understand and participate in the treatment. Medicare would not pay PHP claims for patients who did not suffer from a mental disorder, nor for the patients whose disorders were not acute or severe enough to interfere with daily life activities. Medicare would not pay PHP claims for patients who suffered from either advanced Alzheimer's disease or dementia. Medicare also would not pay PHP claims for patients who were active substance abusers.

Medicare requires four types of documents to substantiate claims: an initial certification, a recertification (for services beyond 18 days), a treatment plan, and progress notes. The initial certification must be completed by the patient's attending physician and cannot be completed by a physician's assistant. A treatment plan also must be signed by the attending physician; a physician's assistant cannot complete the treatment plan. The physician must also be involved in establishing the treatment plan and actively treating the patient. In order to submit proper progress notes, a medical professional must see the patient, provide the treatment, and write the progress note. Medicare requires that the information contained in these documents be true and be completed before the submission of a PHP claim.

7

ATC generally did not comply with the LCD's guidelines.  At its peak, ATC had seven locations, all offering PHPs, staffed by therapists, nurses, doctors, physician's assistants, and administrators who all assisted with the fraud by providing falsified documentation to make it appear to Medicare that ATC provided adequate and medically necessary treatment.  ATC employees, including doctors and physician's assistants, falsified doctor's notes, initial psychiatric evaluations, discharges, intakes from therapists, treatment plans, and daily progress notes.  ATC employees falsified, for example, patient history, onset of qualified mental illness, the seriousness of a condition, the fact the patient was recently under the treatment of a psychiatrist, prescribed medication, and patient quotes.

## D.    Bergman's Role

ATC hired Bergman as a physician's assistant for Dr. Roberto Ayala, a licensed psychiatrist and medical director for ATC's Homestead office.  Dr. Ayala did not actually see the patients and instead allowed Bergman to see the patients and sign the documentation.  Because Dr. Ayala was not around, Valera would introduce Bergman to the patients as the doctor.  In his role, Bergman created, or dictated, initial psychiatric evaluations, weekly physician's notes, and discharge summaries, even though he was not a doctor.  At the beginning, Dr. Ayala would sign these notes that Bergman created, but later on both Dr. Ayala and Bergman signed the notes.

8

Bergman falsified notes for patients who were not impaired by an acute psychiatric condition and for patients with mental impairments such as dementia that would prevent them from understanding and benefiting from a PHP. Bergman often wrote notes for patients he never saw and for days he was not even at the office. Instead, Bergman would sit in the medical records room, get the patient's chart, and dictate notes from the chart as if he had seen the patient. ATC submitted Bergman's notes to Medicare for payment.

At any given time, the Homestead office had between 60 and 110 patients who needed to be seen each week. Bergman, however, came into the office infrequently, maybe once a week, and would only see a handful of patients for just a few minutes before leaving. By 2008, Bergman was spending very little time with the patients, only two or three hours, when he did come to the office. Some weeks Bergman did not come to the office at all. For the patients he did not see, Bergman would dictate the charts as if he had seen the patient. He did this from 2003 through 2008.

On some occasions, Bergman would dictate patient notes to bill for patients who were not at ATC because they were already discharged. Some patients actually needed treatment but never received it. Bergman's notes were "cookie cutter" and often very similar to one another.

9

ATC also hired Dana Gonzalez to fabricate notes and other paperwork for Bergman, who he was behind on the paperwork needed to bill Medicare. When Gonzalez started, she had a meeting with Valera and Bergman at which Valera stated that Gonzalez would be helping Bergman catch up on the patient notes and whatever else was not completed in the chart. Valera trained Gonzalez to take Bergman's "cookie cutter" notes and to individualize the notes by adding made-up quotes from the patients to match the diagnosis. Valera also trained Gonzalez on how to fill out the charts. For two years, Gonzalez wrote approximately 200 notes per week for Bergman using information she made up and not based on any treatment provided to the patients. Gonzalez wrote the notes from her apartment.

Gonzalez never discussed with Bergman or Dr. Ayala what she was writing in the notes. Instead, Gonzalez would give Bergman a stack of 200 completed notes for the week, which Bergman would sign without reading. For the notes that Bergman dictated, Gonzalez would go through them and individualize them by adding statements from the patients, symptoms, examples, medication changes, and their progress. Bergman signed these notes as well. Unlike other ATC employees, Bergman's pay was tied to the number of notes he dictated.

Based on Bergman's paperwork, ATC billed Medicare for approximately $38 million for which Medicare paid ATC a little over $18 million.

10

### E.    Bergman's Testimony

Neither Bergman nor Santaya called any witnesses or introduced any evidence at trial, except that Bergman testified in his own defense. Bergman's version of his work for ATC is quite different from what the government's witnesses recounted.

According to Bergman, Dr. Leonardo Alonzo invited him to work at ATC. Bergman worked at ATC as a physician's assistant from 2003 to late August 2008. At some point, possibly 2003, Dr. Alonzo quit, and Dr. Ayala came to work at ATC. Around the same time, Bergman started working at ATC's Homestead office. During this time, ATC expanded both its Miami and Homestead offices.

Bergman testified that the Homestead office had at most 30 or 40 patients in a week at its busiest. At both clinics together, ATC had at most around 100 patients. Bergman said there were only one or two weeks during the five years he worked at ATC when he did not see patients. Bergman also said that the patients can go two weeks without being seen.

Bergman further testified that he performed the initial psychiatric evaluation of all his patients. Bergman said that a lot of these patients were his patients from the hospital because he got referrals from physicians he worked with outside of ATC. Bergman claimed that on many occasions he would have seen a patient at the hospital the day before the patient was admitted to ATC's PHP. Bergman did

11

his dictations in his own office at ATC's Miami location, but at the Homestead location he did not have his own office.  Bergman would either do his dictations in the space available at ATC's Homestead office or do them at home using his notes from the day.  Bergman then called the dictation company and recorded the notes, recording when the patient was seen, the patient's chief complaint, the patient's mental status, and the medication management.  Bergman explained that the dictations and resulting notes for different patients were often similar, with the same statements being pasted in, because the patients were on the same treatment plan, namely PHP services five days a week.

On rare occasions following Bergman's initial psychiatric evaluation, Bergman would call Dr. Ayala to see a patient when he was unsure what to do with the patient.  After Dr. Ayala visited, the patient would be admitted to the program.  The next time Bergman saw a patient, he would do a progress note.

Between Bergman's initial evaluation and first progress note, however, the patient would be involved in the PHP treatment.  According to Bergman, the patient would see a social worker and go to therapy groups.  Some of these groups were for substance abusers, including separate groups for those who were also depressed, psychotic, or elderly.  There were also groups dedicated to medication management, cognitive therapeutics, and Gestalt therapy.  Bergman would refer

12

patients to a group and would change a patient's group if the patient was not improving, but he was not involved in the actual group therapy.

Bergman stated that he saw patients with depression, psychotic patients, substance abusers with psychoses, substance abusers with depression, and patients with signs of Alzheimer's, among others. According to Bergman, patients with early stages of dementia can become either agitated or depressed, which is sometimes caused by their medication. Bergman claimed that ATC did not have patients who had such severe memory loss that they did not know what they were doing. Bergman testified that he never admitted anyone whom he thought had advanced dementia or Alzheimer's. Indeed, Bergman said he brought up the issue of whether dementia patients could benefit from a PHP with ATC's physicians and was told that the patients could benefit at the beginning while they still understood what was happening to them.

Before he left ATC, Bergman was doing fewer and fewer evaluations, and ATC had hired another medical professional to do evaluations at its Homestead office. ATC paid Bergman $30 for evaluations and $15 for follow-ups. In 2007, ATC paid Bergman a total of $91,697. According to Bergman, $90,000 was low for physician's assistants, who normally make between $130,000 and $150,000 each year. While working for ATC, Bergman billed ATC, not Medicare, by giving ATC a list of the patients he saw and for whom he dictated notes.

13

Bergman testified that people at ATC called him "Dr. Roger," but never Dr. Bergman, and that he never held himself out as a physician or as Dr. Ayala. Bergman said he always worked under Dr. Ayala's supervision and when Dr. Ayala vacationed outside of the country, Dr. Ayala arranged for another physician to cover.

Bergman further testified that he had never seen Dana Gonzalez in his life and had no awareness of her prior to trial. Bergman claimed that to his knowledge he signed only the notes he did himself and there were no other notes. Bergman stated that, at some point, Valera asked him to complete notes for old files for patients who had left. Bergman refused Valera's request because he had never seen the patients.

## F.    Bergman's Departure from ATC

Bergman and Valera also tell contradictory stories about why Bergman no longer worked at ATC by September 2008.

Valera testified that she and Duran (her boyfriend) "got tired" of how behind Bergman was in his work and "we let him go." According to Valera, Bergman was "super behind" in his dictations and notes, and she and other employees had to spend "hours and hours and hours" fixing his documentation, downloading, and making corrections. Valera testified as follows:

> Q. And it was customary at your company to give employees that you
> wanted to terminate an opportunity to resign before they were fired?

14

A. Correct

. . . .

Q. And although isn't it true that you wanted him out, you gave him an opportunity to resign and he did resign?

A. I didn't want to cause any damage to anybody.  It's better when you resign.

Valera thus gave Bergman an opportunity to resign, instead of being fired, and he did so.

Bergman's story is quite different.  He contends that he voluntarily left ATC because it had inappropriate patients.  Just prior to leaving ATC, Bergman remembers going to the Miami office to see patients, going to visit a group he had never seen before, and finding a group of patients just staring into space.  Bergman was told not to worry about it because they were not his patients.  Indeed, there were other doctors working at ATC who had their own groups of patients.

Bergman subsequently told Valera and Duran that he would not be coming back.  Bergman claimed that he had seen patients inappropriate for a PHP on only one prior occasion when a group of them came to the Homestead location.  Bergman also claimed that he made a big fuss about it until another ATC employee told him those patients would not be brought back.

Bergman testified that he told Duran, while Valera was in the room, that he would not be coming back to ATC.  Duran asked him why, and Bergman

15

responded, "you know why." Bergman stated that he then sent in a resignation letter. While the letter itself is not in the record, Bergman testified that he wrote and signed the resignation letter and his wife mailed it.

Valera disputed Bergman's testimony about his departure. Valera said that Bergman never raised any concerns that he was leaving because of fraud at ATC. Valera testified that Bergman falsified billing for five years, and never said he would stop. Instead of firing him, Valera merely gave Bergman the opportunity to resign first, which he did in August 2008. ATC last paid Bergman via a September 5, 2008 check.

## G.    ATC's Patient Recruitment

In contrast to Bergman's role in creating notes for billing, Santaya's role was to recruit patients, which he did in exchange for kickbacks. Legitimate PHPs typically attract patients through referrals from outpatient providers, usually psychiatrists, who know the patients fairly well and know the warning signs for when a patient's condition is worsening. None of ATC's referrals came from a psychiatrist. Rather, ATC paid hundreds of other people for those referrals, including Santaya.

ATC paid outside patient recruiters, also called patient brokers, for each patient sent to an ATC center. When ATC began paying for patients, they asked the recruiters to provide only Medicare patients. Some of the recruiters were

16

owners of assisted living facilities or halfway houses who sent their residents to ATC.  Other patient recruiters, like Santaya, went into the community and recruited patients from low-income housing, retirement homes, or apartments with large numbers of disabled or elderly people.  These patient recruiters came from outside ATC, and ATC did not consider them employees.  Rather, ATC had a rule that its own employees could not recruit patients.

ATC paid its patient recruiters in cash and checks to avoid creating a paper trail.  Patient recruiters in turn paid cash to some patients to get them to go to ATC.  ATC paid its recruiters at rates between $30 and $50 per patient per day.  ATC also paid a one-time $100 bonus to the patient recruiter for each new patient.

From 2005 to 2010, ATC tasked Margarita Acevedo with ensuring that ATC's centers remained full of patients.  Acevedo did this by marketing ATC to patients and negotiating deals with patient brokers, like Santaya, to pay them money to send patients to ATC.  Acevedo handled all aspects of this kickback scheme, including negotiating the deals, tracking the amounts owed, delivering the payments, and finding people to assist her.

Acevedo brought Sandra Jimenez into the company to handle the patient recruiting duties for the Homestead office, including marketing and paying recruiters.  Acevedo previously knew Jimenez through a mutual friend, and both are from Colombia.  Acevedo convinced Duran to meet with Jimenez at lunch to

17

see if he would hire her. Both Acevedo and Jimenez had an intimate relationship with Duran while they all worked at ATC and while Duran was dating Valera.

Each of ATC's offices maintained a "Master Patient Log" ("MPL") in a spreadsheet to keep track of the admission of the patients, their stays, and the amounts owed to the patient recruiters.[1] The operations coordinator at each location did the intake and recorded the relevant patient information in the spreadsheet, including the patient's admission date, discharge date, first name, last name, and record number, as well as the name of the person who referred them. Acevedo and Jimenez used the MPL, along with the Medicare billing, to calculate the amount owed to each recruiter based on that recruiter's patients, the number of days the patients attended, and the negotiated rate with the recruiter.

ATC paid its patient recruiters hundreds of thousands of dollars each month in cash, which it did to avoid any red flags or paper trail. Duran, Acevedo, and Jimenez obtained the large amounts of cash by cashing checks made out to fake employees or shell companies. Some combination of Valera, Duran, and Acevedo then would count the money and stuff it into envelopes. Acevedo and Jimenez delivered the envelopes of cash to the patient recruiters.

---

[1]There were thus multiple Master Patient Logs. The government also repeatedly refers to "kickback logs," which were in fact derivatives of the Master Patient Logs. For simplicity, we refer to all of these documents as the "MPL."

18

### H.    Jimenez's Recruitment of Patients

Although ATC did not allow its own employees to recruit patients, Jimenez testified that she recruited some patients herself under the table through three patient brokers.  Jimenez had deals with these patient recruiters where they would give her the money for patients she recruited after ATC paid them.  Alternatively, Jimenez would take extra money out of the envelopes after falsely increasing the number of days a patient stayed at ATC.

To carry out this scheme, Jimenez would falsely tell the ATC office coordinator that a patient she had brought to ATC was brought by one of the three patient recruiters with whom she had arrangements.  The office coordinator would then put that patient recruiter's name into the MPL.  Thus, the MPL contained inaccurate information about the actual source of the patient.

### I.    Santaya's Role

Defendant Santaya was one of ATC's paid patient brokers from February 2006 to October 2010.  Acevedo testified that she paid cash kickbacks to Santaya and identified him sitting in the courtroom.  Jimenez also identified Santaya and testified that she paid him money to bring patients to ATC.  The MPL identified Santaya as a referral source.

Acevedo testified that Santaya paid his patients to attend ATC and would discuss those payments with Acevedo either when Santaya fronted money to

19

patients before ATC had paid him, or when a patient would tell Santaya that the patient was short on days attended at ATC.  Acevedo also testified that she coached Santaya about what symptoms, such as depression or not eating, his patients needed to complain in order to get admitted into ATC's PHP, and Santaya trained his patients to say the right things.  Santaya knew of ATC's policy of recycling patients and would contact Acevedo and Jimenez to check if any of his patients were due to return so he could bring them back to ATC.

Defendant Santaya's kickback started at $30 per patient per day but eventually increased to $45.  ATC paid Santaya an additional $100 for each new patient.  Santaya generally received between $5,000 and $13,000 from ATC each month.  In total, ATC billed Medicare $2.9 million for Santaya's patients, for which Medicare paid out $1.2 million.

## J.    Procedural History

On January 28, 2014, the government filed an indictment against Bergman, Santaya, and a third defendant.  On June 24, 2014, a grand jury returned a superseding indictment against those three defendants.  The superseding indictment charged Bergman with (1) conspiracy to commit health care fraud and wire fraud, in violation of 18 U.S.C. §§ 1343, 1347, and 1349 (Count 1) and (2) conspiracy to make false statements relating to health care matters, in violation of 18 U.S.C. §§ 371 and 1035 (Count 2).  The superseding indictment charged

20

Santaya with (1) conspiracy to commit health care fraud and wire fraud, in violation of 18 U.S.C. §§ 1343, 1347, and 1349 (Count 1), (2) conspiracy to pay and receive bribes and kickbacks in connection with a federal health care benefit program, in violation of 18 U.S.C. § 371 and 42 U.S.C. § 1320a-7b (Count 3), and (3) receipt of bribes and kickbacks in connection with a federal health care benefit program, in violation of 42 U.S.C. § 1320a-7b(b)(1)(A) (Counts 4-5).

On July 28, 2014, following a trial, the jury found Bergman and Santaya guilty on all counts. Having already denied motions for acquittal from Bergman and Santaya during the trial, the district court later denied Bergman's post-trial motions for judgment of acquittal and for new trial, as well as Santaya's post-trial motion for new trial.

The district court sentenced Bergman to 180 months in prison on Count 1 and 60 months on Count 2, running concurrently. The district court sentenced Santaya to 150 months in prison on Count 1 and 60 months on each of Counts 3, 4, and 5, all running concurrently.

## II.   SUFFICIENCY OF THE EVIDENCE

Both Bergman and Santaya appeal the district court's denial of their motions for acquittal. "We review de novo the denial of a motion for judgment of acquittal." United States v. Hernandez, 433 F.3d 1328, 1332 (11th Cir. 2005). In doing so, "our evaluation is comparable to the standard used in reviewing the

21

sufficiency of the evidence to sustain a conviction." United States v. Ellington, 348 F.3d 984, 989 (11th Cir. 2003). Under that standard, we review the evidence presented at trial in the light most favorable to the government, and we draw all reasonable factual inferences in favor of the jury's verdict. United States v. Westry, 524 F.3d 1198, 1210 (11th Cir. 2008).

## A.    Test for Withdrawal from Conspiracy

One of Bergman's defenses was that he withdrew from the conspiracy in either August or September 2008, which meant that the January 2014 indictment was barred by the five-year statute of limitations. At Bergman's request, the district court fully instructed the jury on his affirmative defense of withdrawal, including the following:

> To prove this defense, the defendant Bergman must establish each and every one of the following things by the preponderance of the evidence:
>
> One, that the defendant Bergman completely withdrew from the conspiracy. A partial or temporary withdrawal is not sufficient.
>
> Two, that defendant Bergman took some affirmative step to renounce or defeat the purpose of the conspiracy.
>
> An affirmative step would include an act that was inconsistent with the purpose of the conspiracy and is communicated in a way that is reasonably likely to reach the other members. But some affirmative step is required. Just doing nothing or just avoiding contact with other members would not be enough.
>
> Three, that defendant Bergman withdrew before the date of January 28, 2009.

22

Defendant Bergman must prove each of the elements as set forth above by a preponderance of the evidence. A preponderance of the evidence simply means an amount of evidence that is enough to persuade that you [sic] the defendant's claim is more likely true than not true. If you determine that the defendant Bergman withdrew from a conspiracy, then you must find him not guilty of that conspiracy.

Bergman does not challenge the jury instruction itself, the existence of the conspiracy, or that he joined it. Indeed, ample evidence established the conspiracy's existence and Bergman's extensive participation.

Rather, Bergman argues that he established his withdrawal defense as a matter of law and that the district court should have granted his motion for judgment of acquittal and not submitted the withdrawal issue to the jury. We review the legal test for withdrawal and then the relevant evidence.

"It is well settled that an accused conspirator's participation in a criminal conspiracy is presumed to continue until all the objects of the conspiracy have been accomplished or until the last overt act is committed by any of the conspirators." United States v. Finestone, 816 F.2d 583, 589 (11th Cir. 1987). "Upon joining a criminal conspiracy, a defendant's membership in the ongoing unlawful scheme continues until he withdraws. A defendant who withdraws outside the relevant statute-of-limitations period has a complete defense to prosecution." Smith v. United States, 568 U.S. __, __, 133 S. Ct. 714, 717 (2013). A conspirator who effectively withdraws is no longer a member of the conspiracy and is not bound by the subsequent acts of the conspirators. Morton's Mkt., Inc. v. Gustafson's Dairy,

23

Inc., 198 F.3d 823, 837 (11th Cir. 1999), amended in part, 211 F.3d 1224 (11th Cir. 2000).

Withdrawal, however, is an affirmative defense, which the defendant has the burden of proving by a preponderance of the evidence in order to overcome the presumption of his continued participation in the conspiracy. Smith, 568 U.S. at __, 133 S. Ct. at 719, 721; Finestone, 816 F.2d at 589. "The defendant's burden in this regard is substantial." Finestone, 816 F.2d at 589.

This Circuit has a well-established, two-prong test for withdrawal: "the defendant must prove that he undertook affirmative steps, inconsistent with the objects of the conspiracy, to disavow or to defeat the conspiratorial objectives, and either communicated those acts in a manner reasonably calculated to reach his co-conspirators or disclosed the illegal scheme to law enforcement authorities."[2] Id. (first emphasis added); see also United States v. Hogan, 986 F.2d 1364, 1375 (11th Cir. 1993) (same); United States v. Pippin, 903 F.2d 1478, 1481 (11th Cir. 1990) (same).

Merely ending one's activity in a conspiracy does not constitute withdrawal. Pippin, 903 F.2d at 1481; see also Finestone, 816 F.2d at 589 ("A mere cessation

---

[2]To satisfy the second prong of communication of withdrawal, the accused conspirator "is not required to notify 'each other member' that he will no longer participate, but the acts of withdrawal must be 'communicated in a manner reasonably calculated to reach co-conspirators.'" United States v. Arias, 431 F.3d 1327, 1341 (11th Cir. 2005) (quoting United States v. U.S. Gypsum Co., 438 U.S. 422, 464–65, 98 S. Ct. 2864, 2887 (1978)).

of activity in the conspiracy is not sufficient to establish withdrawal."); United States v. Badolato, 701 F.2d 915, 921 n.4 (11th Cir. 1983) (same).  "Withdrawal from a conspiracy is only a defense if the actor affirmatively withdrew; it is not enough that he merely ceased to participate."  Hogan, 986 F.2d at 1375.  Thus in this Circuit, it has long been necessary that the conspirator prove that he undertook affirmatives steps "to disavow or to defeat" the objects of the conspiracy.  The defense of withdrawal is not available to one who merely ends his participation in the conspiracy.

In several cases, this Court has affirmed criminal convictions, finding that the evidence was insufficient to warrant a jury instruction on the withdrawal defense or to make the withdrawal defense available at all.  See Hogan, 986 F.2d at 1375 (drug conspiracy); Pippin, 903 F.2d at 1481-82 (bid-rigging conspiracy); Finestone, 816 F.2d at 588-89 (drug conspiracy).

In United States v. Arias, however, this Court vacated a Medicare fraud conviction because the district court refused to give a jury instruction on the withdrawal defense.  431 F.3d 1327, 1341-42 (11th Cir. 2005).  In Arias, the defendant, Dr. Sarduy, worked at First Option Medical Center and knowingly certified false diagnoses, facilitating First Option's billing Medicare for unnecessary medication and medical equipment.  Id. at 1339.  Blue Cross/Blue Shield served as the administrator of Medicare Part B that paid First Option.  On

25

August 28, 1995, Dr. Sarduy sent a letter to Blue Cross/Blue Shield "wherein he advised them that he was no longer seeing patients at First Option, and requested his cancellation as [a] provider at First Option." Id. at 1341. After he sent the August 28 letter, Dr. Sarduy's name was crossed off the list of individual provider numbers on First Option's billing enrollment form, and checks paying Dr. Sarduy ceased in September 1995. Id. There was also evidence that, subsequently in October 1995, First Option "was attempting to engage Sarduy's continued participation." Id. On December 4, 1995, Dr. Sarduy sent a second letter to Blue Cross/Blue Shield that "again request[ed] Sarduy's cancellation as a provider for First Option, and advise[ed] Blue Cross/Blue Shield that he had not seen any patients since sending the previous cancellation letter in August." Id.

In vacating Dr. Sarduy's Medicare fraud conviction, this Court concluded that: (1) Dr. Sarduy "provided a sufficient foundation in the evidence from which a jury could conclude that he took affirmative steps to withdraw from the conspiracy and to communicate that withdrawal to his co-conspirators";[3] (2) Dr. Sarduy "was entitled to the jury instruction he requested" on his withdrawal defense; and (3) "[t]he district court's erroneous refusal to charge the jury as requested mandates that we vacate Sarduy's conviction." Id. at 1341-42. Because Dr.

---

[3]In Arias, an expert witness testified that a physician could "reasonably assume" that, by notifying Medicare in this fashion, "Medicare would notify any other participating providers." Arias, 431 F.3d at 1341.

26

Sarduy voluntarily stopped seeing First Option patients, twice advised Blue Cross/Blue Shield of that fact, and requested his provider number be cancelled, this Court concluded that Dr. Sarduy had presented sufficient evidence such that the jury should have considered his withdrawal defense. Arias supports the district court's decision here to charge the jury on Bergman's withdrawal defense.

We recognize that Bergman argues that he was entitled to more than a jury charge and that the district court should have granted his motion for acquittal as a matter of law. Bergman relies on Morton's Market, so we discuss why that decision does not compel Bergman's acquittal as a matter of law.

Morton's Market is a civil antitrust case, where the plaintiff companies, retailers of milk, sued the defendant dairies that produced and sold the milk to them. 198 F.3d at 826-27. The plaintiff retailers alleged that the defendant dairies engaged in unlawful price-fixing of wholesale milk prices to them as retailers. Id. at 826. Defendant Pet, Inc., one of the dairies, had sold its dairy entirely back in 1985 and thus claimed that it had withdrawn from the milk price-fixing conspiracy in 1985. Id. at 837. This meant that the plaintiffs' 1993 civil lawsuit was barred by the four-year statute of limitations. Id. at 837. The district court granted defendant Pet, Inc.'s motion for summary judgment. Id. at 839.

Affirming, this Court concluded that defendant Pet, Inc. had withdrawn from the conspiracy upon the sale of its dairy, stating:

27

> [Pet, Inc.] did nothing more to assist or participate in the price-fixing activities of the other dairies. This retirement was communicated to the other dairies by the media. They knew that from that time on, Pet would not lend its services to the conspiracy. Thus, the purposes of the conspiracy were defeated at least as to Pet. We conclude, therefore, that Pet did effectively withdraw from the price-fixing conspiracy upon the sale of its dairy.

Id. We described Pet's "break with the other conspirators" as "both clean and permanent." See id. We added too: "[T]he law has given effect to a conspirator's abandonment of the conspiracy only where the conspirator can demonstrate that he retired from the business, severed all ties to the business, and deprived the remaining conspirator group of the services which he provided to the conspiracy." Id. We said: "Resignation from the conspiring business has frequently been held to constitute effective withdrawal." Id.

Against this background of Eleventh Circuit decisions, we consider Bergman's evidence.

## B.    Bergman's Evidence as to Withdrawal

The criminal charges against Bergman are subject to a five-year statute of limitations. See United States v. McNair, 605 F.3d 1152, 1213 (11th Cir. 2010). Bergman ceased working at ATC in August 2008, and ATC sent his last check on September 5, 2008. This was more than five years before the January 28, 2014 indictment of Bergman. Thus, the question is whether Bergman took affirmative steps "to disavow or defeat" the conspiratorial objectives by ceasing his work at

28

ATC.  The problem for Bergman is the conflicting testimony over why he ceased working at ATC.

Bergman's testimony, if believed, showed that he found patients staring into space who did not qualify for PHP treatment at ATC's Miami office, that he was upset about it, and that he thereafter voluntarily resigned because of the fraud. Bergman testified that he had a meeting with Valera and Duran where he informed them he was leaving ATC.  Bergman also testified that his wife subsequently mailed in his resignation letter.

Bergman's testimony, claiming how he left ATC, is diametrically opposed to Valera's testimony that ATC let Bergman go because of his unsatisfactory work. Valera's testimony, if believed, is that she let employees whom she was firing, like Bergman, resign.  The jury could have believed Valera's version of events and found that Bergman was forced out of ATC because of his sloppy and untimely dictations and that Valera merely allowed him to resign to avoid being fired and to save face.  The jury could have reasonably found that Valera took the affirmative step of getting rid of Bergman and that Bergman did not take affirmative steps "to disavow or defeat" the objectives of the conspiracy.

In sum, Bergman's withdrawal defense depended on who the jury believed. Therefore, the district court did not err in submitting the withdrawal issue to the jury and in denying Bergman's motion for acquittal as a matter of law.

29

The dissent argues (1) that "Mr. Bergman <u>chose</u> to resign," rather than wait and be fired by Valera and (2) that thus his resigning constitutes withdrawal as a matter of law. Dissenting Op. at 4. The dissent's argument isolates the resignation letter from the factual context and circumstances of Bergman's departure from ATC. In contrast, the district court properly let the jury consider all the evidence about Bergman's cessation of work at ATC and decide whether Valera took the affirmative step of getting rid of Bergman or whether Bergman took an affirmative step to disavow or defeat the conspiracy.

The dissent also argues that our prior "holding" in <u>Morton's Market</u> "requires" our panel to hold that Bergman's resignation constitutes withdrawal from the conspiracy <u>as a matter of law</u>. Dissenting Op. at 1, 6. As we quoted earlier, there is language in <u>Morton's Market</u> stating that resignation from a conspiring business has been held to constitute effective withdrawal. <u>Morton's Market</u>, however, involved an owner-company's sale of its entire dairy business and did not involve an employee departure or employee "resignation" under threat of firing.

Therefore, the holding in <u>Morton's Market</u> is that the owner-company's sale of its entire business and exit from the dairy business constituted withdrawal from the milk-pricing conspiracy. 198 F.3d at 839. Our Circuit's well-established "prior panel precedent rule obligates us to follow the holdings of an earlier

30

decision [Morton's Market], but the holdings of a prior decision [Morton's Market] can reach only as far as the facts and circumstances presented to the court in the case which produced that decision." Anders v. Hometown Mortg. Servs., Inc., 346 F.3d 1024, 1031 (11th Cir. 2003); see also Edwards v. Prime, Inc., 602 F.3d 1276, 1298 (11th Cir. 2010) (Under our prior panel precedent rule, we "have pointed out many times that regardless of what a court says in its opinion, the decision can hold nothing beyond the facts of that case").

Because there was no employee resignation from a company in Morton's Market, much less a "resignation" under threat of firing, Morton's Market does not contain the holding that the dissent posits. Even Morton's Market does not state that all resignations constitute effective withdrawal no matter the circumstances. In any event, nothing herein should be read as holding that an employee's resignation cannot be an effective withdrawal. All we say here is that under the particular factual context and circumstances in this case the district court did not err in letting the jury decide whether to believe Valera or Bergman's version of Bergman's departure from ATC.

If anything, our precedent in Morton's Market actually supports affirmance here. Morton's Market involved the owner's sale of its entire business. In contrast, if Valera is believed, Valera took the relevant step here. Bergman ceased participation because Valera gave him no choice. Here the jury could reasonably

find that Bergman only resigned under threat of firing and that his departure in those particular circumstances was not an affirmative step on his part "to disavow or defeat" the objectives of the conspiracy.

Furthermore, this case is more like Arias, where the evidence created a jury issue as to withdrawal, just as it does here. In Arias, defendant Dr. Sarduy acted "to disavow or defeat" the conspiracy by twice advising the Medicare administrator that he was no longer seeing First Option patients and twice requesting the cancellation of his Medicare provider number. Viewing the evidence in the light most favorable to the government, we cannot say the district court erred in letting the jury decide the withdrawal issue and in denying Bergman's motion for a judgment of acquittal.

## C.    Santaya's Receipt of Kickbacks

Santaya challenges the denial of his motion for acquittal based on the sufficiency of the evidence in support of his conviction for conspiracy to commit health care fraud under 18 U.S.C. §§ 1347 and 1349.

Section 1349 "makes it unlawful to attempt or conspire to commit a § 1347 crime of health care fraud." United States v. Moran, 778 F.3d 942, 960 (11th Cir. 2015), cert. denied sub nom. Huarte v. United States, 136 S. Ct. 268 (2015). Section 1347 makes it unlawful to "knowingly and willfully" engage in a scheme (1) "to defraud any health care benefit program" or (2) to use false pretenses to

32

obtain money from "any health care benefit program," "in connection with the delivery of or payment for health care benefits, items, or services." 18 U.S.C. § 1347.

"To sustain the conspiracy conviction under 18 U.S.C. § 1349, the government must prove that (1) a conspiracy existed; (2) the defendant knew of it; and (3) the defendant knowingly and voluntarily joined it." Moran, 778 F.3d at 960. The government may prove these elements through circumstantial evidence. Id. The first element is not at issue in this appeal.

As for the second element, the government need not prove that the defendant knew every aspect of the conspiracy but merely that the defendant knew of the "essential nature" of the conspiracy. Id.; United States v. Vernon, 723 F.3d 1234, 1273 (11th Cir. 2013). As for the third element, voluntarily joining, the government can meet this burden "'through proof of surrounding circumstances such as acts committed by the defendant which furthered the purpose of the conspiracy.'" Moran, 778 F.3d at 961 (quoting Vernon, 723 F.3d at 1274).

As detailed above, the government introduced ample evidence to uphold Santaya's conviction on Count 1 for conspiracy to commit health care fraud. First, the evidence showed that, in exchange for kickbacks, Santaya recruited patients for ATC regardless of their medical needs for PHP services. Second, at ATC's instruction, Santaya targeted only patients who were Medicare beneficiaries.

33

Third, also at ATC's instruction, Santaya coached his Medicare recruits to lie that they suffered from symptoms, such as depression and not eating, and to remain silent about their bribes while at ATC. Fourth, ATC fraudulently billed Medicare for Santaya's recruits. From this evidence, a reasonable jury could conclude (1) that Santaya knew that ATC was fraudulently billing Medicare because he was paid to provide, and he in fact provided, ATC with many Medicare beneficiary patients who lied about their symptoms in order to qualify for PHP treatment and (2) that Santaya knowingly and willfully joined and furthered the conspiracy by recruiting patients. While it was not Santaya's job to fill out the Medicare paperwork, it was his job to recruit the Medicare patients for that fraudulent Medicare-billing scheme.

We therefore affirm Santaya's conviction for conspiracy to commit health care fraud under §§ 1347 and 1349.

### III.    JURY SELECTION

Santaya challenges the decision by the district court and the magistrate judge, who conducted voir dire, to deny his motion to strike the entire jury panel. As background to this issue, Juror Number 12 had been the victim of credit card fraud four times. Defense counsel discussed with Juror Number 12 whether she would be able to set aside her own prejudices despite being a victim of fraud.

34

Juror Number 12 indicated that she could not "say for sure" but that she would

"have to hear and listen to the case."

The magistrate judge then asked Juror Number 12 this series of questions:

BY THE COURT:

Q. . . . Juror Number 12. So I understand that you've been a victim of credit card fraud, I think it was four times, and your identity was compromised and somebody was making unauthorized charges on your credit card.

Can we agree that those situations, those four credit card situations, as far as you know, have absolutely nothing to do with the Medicare fraud charges that this trial is going to be about?

A. (By [Juror Number 12]) Correct.

Q. All right. So are you telling us that simply because you were involved as a victim of credit card fraud, that you're going to perhaps convict a defendant on less evidence than the law requires simply because you've been a victim of credit card fraud and, my gosh, you just have it in for somebody, and therefore, you're going to unfairly convict one of these two defendants?

A. No, that's not what I said. I just --

Q. I know what you said. I'm just following up.

A. Okay.

Q. So can you tell us that you would listen to all the evidence in the case that would come forth in this trial before making a decision?

A. Of course.

Q. Do you think that your experience in being a victim of credit card fraud four times would mean that you couldn't follow the instructions that the judge would give you?

35

A. No.

Q. So if the judge were to say to you, in order to convict these defendants, the Government has to prove its case beyond a reasonable doubt, would you be able to follow that instruction?

A. Yes.

Q. And if the Government didn't meet that instruction, would you be finding that defendant guilty anyway simply because some time in your history you were a victim four times of credit card fraud?

A. No.

Q. So now that you think about it, would you be able to be a fair juror and follow the judge's instructions even though you're upset about being a victim of credit card fraud, in particular four times, and in general upset with the whole subject matter of fraud?

A. Yes.

Santaya argues that, in this exchange, the magistrate judge berated the juror and precluded the rest of the jury panel from being truthful about their ability to be unbiased.

"We review the district court's determination whether to strike an entire jury panel for manifest abuse of discretion." United States v. Trujillo, 146 F.3d 838, 842 (11th Cir. 1998). "The party challenging the refusal to strike a panel must demonstrate that the juror in question exhibited actual bias: That is, either an express admission of bias, or proof of specific facts showing such a close connection to the circumstances of the case that bias must be presumed." Id. at 842-43 (quotation marks omitted).

36

Here, the district court and magistrate judge did not abuse their discretion by not striking the entire jury panel. Simply put, Santaya has not demonstrated any bias on behalf of Juror Number 12 or any other member of the jury. See Trujillo, 146 F.3d at 842-43. The magistrate judge's questioning properly inquired into how Juror Number 12's past experiences would affect her decision-making in specific ways. The questioning revealed that the juror could serve fairly. The transcript also does not indicate that the magistrate judge's questioning prevented any other jurors from speaking about their biases. Indeed, defense counsel had already extensively questioned several jurors about their potential biases from having been victims of fraud. Even if the magistrate judge's questioning had some imperfections, it was not an abuse of discretion for the district court or the magistrate judge to deny Santaya's request to strike the entire panel.

## IV.   ADMISSION OF EVIDENCE

### A.    Intimate Relationships at ATC

Bergman next claims that the district court erred in restricting his cross-examination of Valera about intimate relationships between ATC's employees. Similarly, Santaya contends that the district court improperly limited his cross-examination of Acevedo and Special Agent Ellen Thomas about those intimate relationships.

37

We review a district court's evidentiary rulings for abuse of discretion. United States v. Lankford, 955 F.2d 1545, 1548 (11th Cir. 1992).[4]  While the trial court has broad discretion to determine the scope of cross-examination, that discretion is limited by the Sixth Amendment, which guarantees the right of confrontation, including the right of cross-examination. Id.  The district court's limitation of cross-examination does not infringe on the defendant's Sixth Amendment rights when (1) the jury heard sufficient facts for it to draw inferences relating to the credibility of the witness and (2) the cross-examination elicited sufficient evidence to allow the defense counsel to argue why the witness might have been biased. Id. at 1556.

Here, we find no Sixth Amendment violation.  The district court allowed both Bergman and Santaya to conduct ample cross-examination to argue their defenses.  For example, the jury heard that Valera dated Duran and that Duran had an affair with Acevedo and Jimenez.  Bergman's counsel questioned Valera repeatedly about how she could now trust Jimenez and Acevedo since she knew that they cheated with her boyfriend.  The jury also heard that Acevedo and Jimenez knew each other through mutual friends before Jimenez came to work at ATC and that Acevedo, Jimenez, and Duran had a separate lunch meeting prior to

---

[4]The government maintains that we should review Santaya's argument for plain error because Santaya did not assert this argument at trial.  We need not decide this issue because there was no abuse of discretion in any event.

38

hiring Jimenez.  Santaya elicited admissions that Jimenez recruited patients on her own, in violation of ATC's rules, and paid herself kickbacks for doing so.  Santaya also elicited admissions that Jimenez supplied false information about the source of those patients she recruited, creating inaccuracies in the MPL.  Jimenez also admitted to lying to federal agents.

The jury heard enough evidence to draw inferences about the witnesses' credibility and for defense counsel to create a record of the witnesses' possible biases.  This evidence allowed Bergman's defense counsel to argue that Bergman was an outsider from this core group of conspirators.  The evidence also allowed Santaya's defense counsel to argue that Acevedo and Jimenez had a special relationship, which explained why they would lie for each other.  The jury also had sufficient evidence to question the truth of the witnesses' testimony as well as the accuracy of the MPL.  Thus, both Bergman and Santaya had a full opportunity to confront the witnesses against them, and no Sixth Amendment violation occurred.  See Lankford, 955 F.2d at 1556.  Because we conclude the defendants had adequate opportunity to cross-examine the witnesses, we need not decide what testimony was technically admissible or inadmissible.

## B.    Medicare Coverage Rules

Bergman argues that the district court improperly admitted lay opinion testimony by Stephen Quindoza about Medicare's coverage rules.  Quindoza has

worked for thirty years as a health care fraud investigator and Medicare claims administrator.  Quindoza testified extensively about Medicare's coverage of PHP services, which patients qualify for PHP treatment, and under what circumstances Medicare would and would not pay for PHP treatment.

Generally, "[t]he district court's evidentiary rulings, including the admission of [lay] witness testimony under Federal Rule of Evidence 701, are reviewed for abuse of discretion."  Moran, 778 F.3d at 958–59.  When, as here, the defendant did not object to the testimony at trial, we review the admission of the testimony for plain error.  United States v. Hall, 314 F.3d 565, 566 (11th Cir. 2002).  Plain error is a more exacting standard.  Moran, 778 F.3d at 967.

Plain error occurs where "there is: (1) error, (2) that is plain, and (3) that affects substantial rights."  United States v. Shelton, 400 F.3d 1325, 1329 (11th Cir. 2005) (quoting United States v. Rodriguez, 398 F.3d 1291, 1297 (11th Cir. 2005)).  If these three conditions are met, an appellate court then has "discretion to notice a forfeited error" if "the error seriously affects the fairness, integrity, or public reputation of judicial proceedings."  Id. (quoting Rodriguez, 398 F.3d at 1297).  The third prong means "in most cases . . . that the error must have been prejudicial."  United States v. Olano, 507 U.S. 725, 734, 113 S. Ct. 1770, 1778 (1993).  The defendant, rather than the government, "bears the burden of persuasion with respect to prejudice."  Id.  Thus, "the defendant's burden with

40

respect to prejudice is to show that the error 'actually did make a difference'" in the outcome of the proceedings. Shelton, 400 F.3d at 1332 (quoting Rodriguez, 398 F.3d at 1300); see also Olano, 507 U.S. at 734, 113 S. Ct. at 1778.

This Court previously addressed the admission of similar testimony by Quindoza, who testified as a lay witness in another trial involving ATC's scheme. United States v. Willner, 795 F.3d 1297, 1316 (11th Cir. 2015). There we reviewed the admission of Quindoza's testimony for abuse of discretion because the defendants objected at trial. Id. In Willner, we found that the district court abused its discretion in permitting Quindoza's testimony because (1) Quindoza was not disclosed as an expert witness, and (2) Quindoza offered expert testimony based on specialized knowledge when he "testified in the form of opinions on a number of issues involving how Medicare functions and what Medicare would do in a number of hypothetical circumstances." Id. at 1318. We concluded, however, that the district court committed only a harmless error in admitting that testimony because the remaining evidence "overwhelmingly" demonstrated that the defendants conspired to commit health care fraud. Id. at 1322.

For two reasons this case is not like Willner. First, we review the admission of Quindoza's testimony not for abuse of discretion but for plain error. Second, the government provided notice that they would call an expert witness to testify about Medicare's coverage rules about admissions, disclosures, patients, treatment,

41

proper billing, the LCD in effect for ATC, and analysis of ATC's claims data. Although that notice did not specifically name Quindoza, the notice indicated that (1) the government maintained its position that such witness testimony "constitutes lay witness testimony" but, if not, (2) the government was giving notice out of an abundance of caution that a portion of the testimony may later be deemed expert witness testimony within the scope of Federal Rule of Evidence 702, which is the expert witness rule.  Because the government disclosed the witness as both a lay witness, or alternatively as an expert witness, we cannot say that the district court plainly erred by allowing Quindoza to testify.[5]

## V.    PROSECUTORIAL MISCONDUCT

Santaya alone claims that the government improperly prejudiced the jury in three distinct ways: (1) shifting the burden of proof onto both defendants by asking Bergman on cross-examination why he had not produced his yellow notepads or testimony from Dr. Ayala to support his story;[6] (2) stating during the closing argument that the defendants had "the gall, the audacity and temerity"  to tell the

---

[5]Notably too, much of Quindoza's testimony summarized the LCD, which was admitted into evidence.  Other witnesses besides Quindoza, including the government's expert witness on PHPs, testified about which patients were suitable for PHP treatment.  Other witnesses also testified about how ATC drafted notes and documentation in order to make it appear to Medicare that ATC was complying with Medicare's coverage requirements.

[6]Santaya further argues that because the government spoke generally about "the defendants" at times during closing argument, any burden-shifting comments about Bergman were also prejudicial to himself.

42

jury "that they weren't part of it and it just didn't happen"; and (3) arguing facts not in evidence during closing by saying that Santaya bought the patients' silence.

Because Santaya failed to object to any of these statements, we review for plain error. United States v. Rivera, 780 F.3d 1084, 1090 (11th Cir. 2015). "To find prosecutorial misconduct, a two-element test must be met: (1) the remarks must be improper, and (2) the remarks must prejudicially affect the substantial rights of the defendant." United States v. Reeves, 742 F.3d 487, 505 (11th Cir. 2014) (quotation marks omitted).

Here, none of the alleged conduct constituted plain error that prejudicially affected Santaya's substantial rights. First, the few above questions to Bergman were isolated and far from permeating the entire trial. See United States v. Simon, 964 F.2d 1082, 1086 (11th Cir. 1992) (explaining that prosecutorial misconduct must permeate the entire atmosphere of the trial); see also United States v. Paul, 175 F.3d 906, 912 (11th Cir. 1999) (finding no prejudice to substantial rights when the government only pointed out that the defendant had an opportunity to present evidence, the lawyers and the court reminded the jury that the government had the burden of proof, and the district court gave an instruction on the burden of proof). The government's cross-examination questions had nothing to do with the weight of the evidence against Santaya. The district court gave jury instructions explaining that the government has the burden of proof and that a criminal

43

defendant does not have to testify, produce any evidence, or prove his innocence. Such an instruction was curative here.  See United States v. Hernandez, 145 F.3d 1433, 1439 (11th Cir. 1998); Simon, 964 F.2d at 1087.

Second, the government's single statement about Santaya defending his innocence did not unfairly prejudice Santaya for exercising his constitutional right to a trial.  It is improper for a prosecutor to attempt to inflame the jury by appealing to such passions or prejudices instead of to reason and to the law. Cunningham v. Zant, 928 F.2d 1006, 1020 (11th Cir. 1991).  In Cunningham, this Court deemed comments by a prosecutor indicating that he was "offended" by the defendant exercising his Sixth Amendment right to trial by cross-examining witnesses to be not only improper but "outrageous."  Id. at 1019.

The government's comment here, although improper, was only one sentence and did not specifically mention a right to a jury trial or the defendant's cross-examination of witnesses.  Given the abundant evidence supporting the defendants' guilt, this lone comment is not enough to reverse the jury's verdict.

Third, read in context, the prosecutor's challenged comment about silence clearly referred to Santaya paying his recruits for their silence while at ATC, not for their silence at trial.  The government presented evidence that Santaya bribed patients and coached them to remain silent about their bribes while at ATC.  This

44

comment was consistent with the evidence and did not affect the outcome of Santaya's trial.

## VI.    SENTENCES

"This Court reviews de novo the district court's interpretation of the guidelines and its application of guidelines to the facts. Findings of fact by the trial court at sentencing, however, are reviewed for only clear error." Moran, 778 F.3d at 959.

### A.    Bergman's Sentence

Bergman appeals his 180-month prison sentence, arguing it exceeds the length necessary to comply with the purposes of 18 U.S.C. § 3553(a).  Bergman's advisory guidelines range was life imprisonment.  U.S.S.G. § 5A n.2.  Because his statutory maximum was a 300-month prison term, that became his recommended guidelines sentence.  See 18 U.S.C. §§ 371, 1343, 1349; U.S.S.G. § 5G1.2(d).  The government recommended a 200-month term of imprisonment.  Bergman requested 72 months, or a maximum of ten years.  The district court sentenced Bergman to 180 months in prison.

We first review whether the district court committed significant procedural error and then determine whether the imposed sentence was substantively reasonable in light of the totality of the circumstances.  United States v. Croteau, 819 F.3d 1293, 1309 (11th Cir. 2016), cert. denied, 137 S. Ct. 254 (2016).  The

45

party challenging the sentence bears the burden of showing that the district court imposed an unreasonable sentence in light of the record and the § 3553(a) factors. Id.

Here, Bergman challenges only the substantive reasonableness of his sentence. "[T]he district court must impose a sentence sufficient, but not greater than necessary, to comply with the purposes listed in 18 U.S.C. § 3553(a)(2)."[7] Id. The district court has discretion to weigh the various factors and to apply a variance. Id.

The district court's below-guidelines 180-month sentence was not substantively unreasonable. For five years, Bergman played a key role in perpetuating an illegal scheme that fraudulently billed Medicare for nearly $200 million. His efforts enabled his co-conspirators to submit falsified medical documentation substantiating their claims to Medicare.

Bergman notes that Dr. Ayala, his boss at ATC, received only a 120-month sentence. Dr. Ayala's conviction, however, had a statutory maximum prison

---

[7]The relevant factors include "the need to reflect the seriousness of the offense, promote respect for the law, provide just punishment for the offense, deter criminal conduct, and protect the public." Croteau, 819 F.3d at 1309. "The district court must also consider the nature and circumstances of the offense, the history and characteristics of the defendant, the kinds of sentences available, the applicable guidelines range, the pertinent policy statements of the Sentencing Commission, the need to avoid unwarranted sentencing disparities, and the need to provide restitution to victims." Id.

46

sentence of 120 months, and he received the maximum.[8]  Bergman's statutory

maximum prison sentence was 300 months.  See 18 U.S.C. §§ 371, 1343, 1349;

U.S.S.G. § 5G1.2(d).  Bergman received a significant downward variance from his

300-month advisory guidelines sentence.  Bergman personally saw more patients

than Dr. Ayala and testified that he was physically present at ATC more frequently

than Dr. Ayala.  Bergman thus could be considered more culpable than Dr. Ayala.

Bergman has not demonstrated that he received a disparate sentence from a

similarly situated co-conspirator.

The district court properly exercised its discretion by sentencing Bergman to

a 180-month prison term, which is well below his guidelines sentence of 300

months.  Doing so did not exceed the purposes of the § 3553(a) factors.  We

therefore affirm Bergman's sentence.

## B.    Santaya's Sentence

Santaya's offense level of 38 and criminal history category of I yielded an

advisory guidelines range of 235 to 293 months in prison.  His total offense level

of 38 consisted of: (1) a base offense level of 31, (2) a two-level increase because

he knew or should have known that the victim was a vulnerable victim under

U.S.S.G. § 3A1.1(b)(1), (3) a two-level increase for a large number of vulnerable

---

[8]Dr. Ayala was convicted of only conspiracy to commit health care fraud, which carries a lower statutory maximum sentence than Bergman's conviction for conspiracy to commit health care fraud and wire fraud.  See 18 U.S.C. §§ 1343, 1347, 1349.

victims under U.S.S.G. § 3A1.1(b)(2), and (4) a three-level increase because he was a manager or supervisor of at least one other participant and the criminal activity involved five or more participants or was otherwise extensive under U.S.S.G. § 3B1.1(b). The government recommended a 150-month prison sentence, and the district court sentenced Santaya to 150 months.

Santaya argues the district court erred in its offense level calculations by applying both the vulnerable victim increases and the manager or supervisor increase. Santaya contends that the patients cannot be both victims and co-conspirators whom he managed.

"The district court's application of the vulnerable victim enhancement presents a mixed question of law and fact, which this Court reviews de novo." Moran, 778 F.3d at 959. We review the district court's determination of Santaya's role for clear error. United States v. Jennings, 599 F.3d 1241, 1253 (11th Cir. 2010).

In Moran, this Court explained that "[a] 'vulnerable victim' is a person 'who is a victim of the offense of conviction,' and 'who is unusually vulnerable due to age, physical or mental condition, or who is otherwise particularly susceptible to the criminal conduct.'" Moran, 778 F.3d at 978 (quoting U.S.S.G. § 3A1.1, cmt. n.2). Some of the patients at ATC did not participate in the illegal scheme and were vulnerable victims. Specifically, Valera testified that ATC had patients who

48

actually needed help but did not receive it.  Some patients had memory problems such as dementia.  Others were substance abusers.  These patients were vulnerable victims.  See Moran, 778 F.3d at 978–79.  Even if Santaya himself did not recruit all of these patients who were vulnerable victims, the district court properly applied the increase because he "knew or should have known that the victims of [ATC's] scheme were vulnerable" and because he was part of the illegal scheme. United States v. Birge, 830 F.3d 1229, 1233 (11th Cir. 2016).

On the other hand, some ATC patients did participate in the illegal scheme. Generally, patient recruiters in a Medicare fraud scheme, like Santaya, play more than a minor role because their conduct is central to the scheme and to the scheme's ability to bill Medicare.  Moran, 778 F.3d at 980.  In this case, Santaya supplied the Medicare beneficiary patients who were crucial to ATC's scheme. Santaya also exercised control over the patients by coaching them on lying about their symptoms and how to behave at ATC.  These patients were often participants in the illegal scheme because they received kickbacks and feigned acute psychiatric illnesses.  The district court thus had the discretion to apply this three-level increase because Santaya supervised these patients he recruited.

The manager or supervisor and the vulnerable victim increases are not mutually exclusive.  There is nothing contradictory about finding that Santaya managed some patients participating in the illegal scheme, while taking advantage

49

of other vulnerable victims.  Valera testified that both willing and vulnerable

victims attended ATC.  We therefore affirm Santaya's sentence.

## VII.   OTHER CLAIMS ON APPEAL

Bergman argues the district court erred by permitting the government to

cross-examine him about a separate Medicare fraud conspiracy in South Florida at

Hollywood Pavilion.  Bergman testified that he did not know anything about

Hollywood Pavilion because it was located in Fort Lauderdale, not Miami.  The

government then stopped questioning him.

The district court did not abuse its discretion by allowing this testimony and

refusing to grant a mistrial.  The testimony the government sought to elicit was

relevant and was not substantially outweighed by any of the risks outlined in

Federal Rule of Evidence 403.  See Fed. R. Evid. 403.  Moreover, the testimony

did not prejudice Bergman because he testified he was unaware of what happened

at Hollywood Pavilion, and the government did not ask him if he was involved in

their conspiracy.[9]

We also reject Santaya's argument that the district court strayed from the

required neutrality by improperly giving a curative instruction and impinging on

his Sixth Amendment right to trial by an impartial jury.  The district court's

---

[9]Bergman also contends that the district court abused its discretion by assisting a witness, Dana Gonzalez, with identifying Bergman by asking an arguably suggestive question.  Because Bergman did not object at trial, we review for plain error, which Bergman has not shown.

curative instruction—to disregard the remark that Santaya's liberty was on the line—caused no prejudice to Santaya because it is a correct statement of law. The jury's role is to determine guilt or innocence and it should reach its verdict without regard to the potential sentence imposed. Shannon v. United States, 512 U.S. 573, 579, 114 S. Ct. 2419, 2424 (1994). None of Santaya's remaining arguments with respect to statements by the district court merit further discussion, and there is no reversible error on these grounds.

We further reject Santaya's argument that the district court erred by not excluding the MPL as inadmissible hearsay. The MPL documented key aspects of ATC's business, including the patient referral source, and was therefore admissible against any defendant who was a co-conspirator. ATC's intake coordinators created the MPL based on information given to them by other ATC employees, and the district court did not abuse its discretion in determining that the intake coordinators and other ATC's employees were Santaya's co-conspirators.

Alternatively, the MPL constitutes a business record that falls within an exception to the rule against hearsay. Fed. R. Evid. 803(6). Here, Valera testified about the procedures used to create the MPL and explained how the MPL was a critical part of ATC's operations. The trial testimony also showed that the intake coordinators obtained the information recorded in the MPL about patient referral sources from persons with personal knowledge of those sources, such as Jimenez.

51

The MPL was thus admissible as ATC's business records.  The fact that Acevedo admitted that she gave false information for the ATC intake coordinators to enter into the MPL goes to the weight the jury should give the MPL, not its admissibility.  Santaya's remaining arguments about the district court's evidentiary rulings lack merit.

## VIII.  CONCLUSION

Based on the foregoing reasons, we affirm the convictions and sentences of Bergman and Santaya.

**AFFIRMED.**

MARTIN, Circuit Judge, concurring in part and dissenting in part:

I agree with almost all of the Majority's opinion. On the issue of Mr. Bergman's conspiracy convictions, however, I read this circuit's precedent to require a holding that Mr. Bergman withdrew from the conspiracy more than five years before he was charged with that crime. Since this is beyond the period of limitations, I understand that Mr. Bergman's conspiracy convictions are due to be vacated, as a matter of law.

Mr. Bergman resigned from ATC in 2008. He was not indicted until 2014. Our precedent says that resignation is sufficient to constitute withdrawal from a conspiracy. And because Mr. Bergman withdrew outside of the five-year statute of limitations, withdrawal is a complete defense as a matter of law. The Majority misreads our precedent and now imposes a new requirement. The Majority opinion requires undisputed evidence of voluntary conduct in order to effectively withdraw from a conspiracy in this circuit. Because this new requirement is not faithful to our precedent, I cannot fully join the Majority's opinion.

## I.

Withdrawal is an affirmative defense for which Mr. Bergman bears the burden of proof, and which he must carry by a preponderance of the evidence. Smith v. United States, 568 U.S. ___, 133 S. Ct. 714, 719–20 & n.5 (2013). It is a "complete defense when the withdrawal occurs beyond the applicable statute-of-

53

limitations period." Id. at 719. The statute of limitations here is five years. See 18 U.S.C. § 3282(a). Mr. Bergman resigned in 2008 and was not charged until 2014. So if he effectively withdrew in 2008, then his participation in the conspiracy was beyond the reach of the limitations period and his convictions must be vacated.

Our circuit precedent requires Mr. Bergman to show: "(1) that he has taken affirmative steps, inconsistent with the objectives of the conspiracy, to disavow or to defeat the objectives of the conspiracy; and (2) that he made a reasonable effort to communicate those acts to his co-conspirators or that he disclosed the scheme to law enforcement authorities." United States v. Starrett, 55 F.3d 1525, 1550 (11th Cir. 1995). There is no dispute that Mr. Bergman communicated his resignation to his co-conspirators in this case. He told them and mailed them a written resignation letter.

The only question, then, is whether the first prong of our circuit's withdrawal test was met as a matter of law. In order to satisfy the first prong of the withdrawal test, the defendant must show "repudiation" by some affirmative step. See United States v. Dabbs, 134 F.3d 1071, 1083 (11th Cir. 1998). "A mere cessation of activity in the conspiracy is not sufficient to establish withdrawal." United States v. Finestone, 816 F.2d 583, 589 (11th Cir. 1987). The Majority characterizes Mr. Bergman's actions as a mere cessation of participation. Maj. Op. at 31–32, 34. But this Court has said that "[r]esignation from the conspiring

54

business has frequently been held to constitute effective withdrawal." Morton's Mkt., Inc. v. Gustafson's Dairy, Inc., 198 F.3d 823, 839 (11th Cir. 1999), amended in part 211 F.3d 1224 (11th Cir. 2000).  Indeed, in Morton's Market, this Court opined that "[a] conspirator unquestionably disavows the conspiracy . . . when he resigns his employment" or "permanently sever[s] his employment relationship." Id. (quotation omitted and alteration adopted).  So long as "[t]he conspirator's break with the other conspirators [was] both clean and permanent," and the co-conspirators are notified of it, withdrawal is effective in this circuit.  Id.

## II.

The Majority holds that the manner in which Mr. Bergman left ATC created a factual dispute for the jury to decide.  But this does not comport with our precedent.  Our caselaw says that choosing to resign is enough to withdraw from a conspiracy as a matter of law.  Although there was indeed conflicting testimony about the circumstances of Mr. Bergman's departure, everyone agrees, at a minimum, that Mr. Bergman chose to resign.  Neither the contrary arguments of the government nor those relied upon by the Majority are persuasive.

The government argues because Mr. Bergman was asked to resign, the jury could have inferred "ATC did not know in 2008 that Bergman would no longer lend his services to perpetuate the fraud."  Although credibility determinations are indeed left to the jury, see United States v. Flores, 572 F.3d 1254, 1263 (11th Cir.

55

2009), there is nothing in the record that the jury could have relied on to support the government's assertion. No one from ATC, or anywhere else, testified that they thought Mr. Bergman might return to the conspiracy.

The Majority has articulated a new theory upon which to affirm Mr. Bergman's conviction. It points to Ms. Valera's testimony that ATC gave Mr. Bergman the opportunity to resign, saying this creates a jury question. Because Ms. Valera's statement conflicted with Mr. Bergman's testimony about whether he chose to resign on his own or chose to resign after being asked to, so goes the Majority's logic, the jury was free to choose between these alternatives. Maj. Op. at 31–32.

But the result is the same either way. Mr. Bergman <u>chose</u> to resign. The Majority itself recognizes that Ms. Valera testified "it was customary at [ATC] to give employees that you wanted to terminate <u>an opportunity to resign before they were fired</u>." Maj. Op. at 16 (emphasis added). So even under Ms. Valera's version of events, Mr. Bergman had a choice before him. He could resign or be fired. He made his choice voluntarily, resulting in the affirmative step that Mr. Bergman took to withdraw. The Majority says that "Bergman ceased participation because Valera gave him no choice." Maj. Op. at 34. But the Majority's own statement of the facts, which is taken in the light most favorable to the government, recognizes the very choice, or "opportunity," that Ms. Valera gave to Mr.

56

Bergman. Id. at 16. In this way, the Majority ignores the reality it highlights.

Applying our circuit's precedent, it seems clear as a matter of law that Mr. Bergman took an affirmative step, inconsistent with the conspiracy, to defeat it—he resigned. See Starrett, 55 F.3d at 1550; Morton's Market, 198 F.3d at 839. He also communicated this affirmative step to his co-conspirators by telling them he resigned and then mailing them a written resignation letter. See id. The Majority's version of events acknowledges the truth of this.

*******

The Majority points to two cases to support its decision to affirm Mr. Bergman's sentence. In Morton's Market, this Court evaluated whether a dairy company had withdrawn from a milk price-fixing conspiracy by selling its dairy. 198 F.3d at 826–27. The issue, we said, was "whether [the company's] sale of its dairy, without more, effectively withdrew it from the milk price-fixing conspiracy, or whether some further affirmative step was required to end its liability." Id. at 839. We recognized "the law has given effect to a conspirator's abandonment of the conspiracy only where the conspirator can demonstrate that he retired from the business, severed all ties to the business, and deprived the remaining conspirator group of the services which he provided to the conspiracy." Id.

The Morton's Market panel said "[r]esignation from the conspiring business has frequently been held to constitute effective withdrawal," and then analyzed

57

whether the dairy company's actions reached that level.  See id.  It reasoned that

after selling the dairy, the company "did nothing more to assist or participate in the

price-fixing activities of the other dairies."  Id.  And because the media reported

the sale, it was communicated to the co-conspirators that "from that time on, [the

company] would not lend its services to the conspiracy."  Id.  On those facts, our

Court concluded the dairy company "did effectively withdraw from the price-

fixing conspiracy upon the sale of its dairy."  Id.

The Majority is quite right that Morton's Market controls the outcome of

this case.  But it requires the opposite result.  Just like with the dairy company,

after his resignation Mr. Bergman "did nothing more to assist or participate" in the

conspiracy.  And he did far more than just rely on the media to communicate this

to his co-conspirators.  He resigned and even sent in a written resignation letter.

The panel in Morton's Market could not have been more clear that resignation is

sufficient to constitute withdrawal in this circuit.  And nowhere does the decision

distinguish between "types" of resignation—that is, being asked to resign or

coming up with the idea on one's own.  In fact, resignation was the panel's gold

standard in determining whether the dairy company had effectively withdrawn

from a business conspiracy.

Although the Majority cites the holding of Morton's Market, it does not

apply it.  It says the Morton's Market holding was that an owner's "sale of its

58

entire business and exit from the dairy business constituted withdrawal." Maj. Op. at 33. Although the Majority goes deep into the facts of Morton's Market, it never explains why the legal reasoning of the opinion does not control here. Morton's Market held that withdrawal was effective as a matter of law when an owner severed ties to the conspiracy and the co-conspirators "knew that from that time on" the owner would no longer "lend its services to the conspiracy." 198 F.3d at 839. I find nothing convincing in the Majority's explanation for why the same result does not follow in Mr. Bergman's case. The statement that "[a]ll we say here" is that it's best left to the jury under the circumstances simply does not explain the failure to apply our circuit's precedent. Maj. Op. at 34.

The Majority also points to United States v. Arias, 431 F.3d 1327 (11th Cir. 2005), saying that Mr. Bergman's case "is more like Arias" than Morton's Market anyway. Maj. Op. at 32. But Arias addressed an entirely different issue than the one presented here. Arias was about whether there was sufficient evidence to require a jury instruction on withdrawal, not whether a defendant withdrew as a matter of law. See id. at 1339–42. And the inquiry in Arias was more fact intensive and therefore appropriate for a jury. The defendant in Arias never formally resigned—he simply stopped seeing patients in a Medicare fraud scheme and told an insurance company. Id. The Majority points out that the defendant in Arias deserved a jury instruction about withdrawal and therefore had his conviction

59

vacated. Maj. Op. at 28–29, 32. But then it reasons that because of this, Mr. Bergman cannot win on an issue the panel in Arias never even addressed. This result is hard to explain, and impossible for me to accept.

III.

The Majority's ruling today is not faithful to our precedent. Instead, the Majority seems to have ignored our circuit's test for withdrawal and abandoned our two-prong test. The Majority has imposed a new, third requirement: undisputed voluntariness. We all agree that the result in Mr. Bergman's case is controlled by Morton's Market, the law of this circuit. See United States v. Smith, 122 F.3d 1355, 1359 (11th Cir. 1997) (per curiam) ("Under the prior panel precedent rule, we are bound by earlier panel holdings, . . . unless and until they are overruled en banc or by the Supreme Court."). The Majority tries to distinguish Morton's Market by pointing out that in that case, a business was sold, but here, Mr. Bergman "only resigned under threat of firing." Maj. Op. at 32–34. The Majority argues that therefore it was Ms. Valera who took the affirmative step, not Mr. Bergman. Id. at 32.

Yet I have found no case in this circuit requiring an exploration of the defendant's motive in taking an affirmative step and concluding that such conduct was voluntary. Nor have I located precedent that requires the step be taken alone. There are certainly no cases that tell us what these new requirements from the

60

Majority mean.  Indeed, adding this voluntariness requirement creates fact questions in every case with a defendant who withdrew from criminal conduct: Was the affirmative step truly voluntary?  Was the withdrawal taken under threat, coercion, or duress?  Did the defendant withdraw alone or did anyone else influence his decision to do so?  Finally on this point, I can find no cases that distinguish being asked to resign from resigning on one's own accord.  Yet the Majority requires proof of that distinction here.  Maj. Op. at 32.  On this record, Mr. Bergman has met our circuit's longstanding test for withdrawing from a conspiracy.  His convictions for conspiracy are therefore due to be vacated, and I dissent to the Majority's failure to do so.

## IV.

As a final note, I add that nothing in the Majority's opinion should be construed to in any way overrule or abrogate our precedent in Morton's Market. Indeed I take the Majority's words at face value:  "[N]othing herein should be read as holding that an employee's resignation cannot be an effective withdrawal." Maj. Op. at 34.

61